ENVIRONMENTAL DEFENSE FUND,
INC., et al., Plaintiffs,

v.

Martin R. HOFFMANN, Secretary of the
Army, and Lt. General William C. Gribble, Jr., Chief of Engineers, United
States Army, Defendants,

Arkansas Game and Fish Commission,
Intervenor-Defendant.

No. LR–71–C–199.

United States District Court,
E. D. Arkansas, W. D.

March 22, 1976.

G. William Lavender, Texarkana, Ark., for plaintiffs.

W. H. Sonny Dillahunty, U. S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

This controversial action has been the subject of consideration for some time. The Cache River—Bayou DeView Channelization Project has been a matter of public interest and discussion since prior to the enactment of the Flood Control Act of 1950. By the Flood Control Act of 1950, Congress authorized construction of the project. Planning funds were regularly appropriated from 1963 to 1971. In July, 1969, a general design for the project was completed.[1]

In 1971, specific plans were completed for the first phase of the project. In July of that year, a contract was let to clear and excavate 6.7 miles of the lower Cache River to relieve backwater flooding. Two million dollars for this phase of construction was appropriated for fiscal 1972 and 1973.[2]

On December 7, 1970, the Corps of Engineers filed a final environmental impact statement (EIS) as required by the National Environmental Policy Act of 1969 (NEPA).

On September 24, 1971, a draft environmental statement was filed by the Corps which discussed a "mitigation plan" to purchase thirty thousand acres of land in the basin to mitigate the wildlife losses.

On October 6, 1971, the plaintiffs filed an action seeking to halt construction of the project. Construction was voluntarily postponed by the Corps to permit the trial court to consider the matter.

On May 12, 1972, the trial court filed a final judgment in favor of the defendants.[3]

The plaintiffs appealed from the decision of the District Court. In its opinion, filed December 14, 1972,[4] the Eighth Circuit Court of Appeals held that the original impact statement, filed by the Corps of Engineers, was inadequate in that it failed to comply with the National Environmental Policy Act of 1969 (NEPA). The Circuit Court also found that the EIS failed to meet the guidelines adopted by the Council on Environmental Quality (CEQ) or the Corps itself.

The Circuit Court of Appeals, supra, further held that District Courts have an obligation to review substantive agency decisions on the merits to determine if they are in accord with NEPA although the ultimate standard of review is a narrow one.[5]

The appellate court remanded the case to the District Court with the following instructions:

"(1) to require the Corps to submit a revised impact statement in accordance with the decision of Judge Eisele in the *Cossatot* case and in accordance with the current guidelines of CEQ and the Corps itself;

(2) to retain jurisdiction of the matter to rule on the sufficiency of the new envi-

---

**1.** The design called for clearing, realignment, enlargement, and rechanneling approximately one hundred forty miles of the Cache River upstream from its junction with the White River, fifteen miles of its upper tributaries, and seventy-seven miles of its principal tributary— the Bayou DeView, for flood control and drainage purposes. Severe floods have occurred in the Basin since 1916 causing substantial damage to farms and urban areas.

**2.** The total cost of the project to the Government was estimated in 1969 to be forty-three million dollars.

**3.** The Honorable J. Smith Henley, Chief Judge, United States District Court for Eastern District of Arkansas.

**4.** *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346 (1972).

**5.** "We caution, as we did in *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, supra* [(8 Cir.), 470 F.2d 289], at 300, that:

'* * * Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)." At page 353.

ronmental impact statement if a prompt request for such review is made;

(3) to review the agency decision in light of the arbitrary and capricious test if a prompt request for such review is made; and

(4) to grant such injunctive relief as the court may feel is appropriate."

Pursuant to remand, the Court scheduled a hearing and, subsequently, issued an order, on March 16, 1973, to implement the instructions of the Court of Appeals. In its order, the Court enjoined and restrained the Federal defendants from any further construction work of any kind related to or in connection with the Cache River—Bayou DeView Channelization Project. Certain cleanup work was allowed in terminating the existing contract. Defendants were specifically permitted to continue with planning in connection with the project short of actual construction. Defendants were to proceed with compiling a new environmental impact statement in accordance with the opinion of the Court of Appeals. The Court included in its order that the injunction continue until the defendants filed with the Council on Environmental Quality and with the Court a new final environmental statement as directed in the opinion of the Eighth Circuit Court of Appeals. The injunction is to remain in force until it is determined that the new final environmental statement is in accordance with the law, and that the defendants are otherwise in compliance with the National Environmental Policy Act, 42 U.S.C. §§ 4332-47.

On November 8, 1974, the defendants filed a new revised final environmental impact statement with the Council on Envi-

ronmental Quality, and on December 17, 1974, defendants filed a motion to dissolve injunction and dismiss complaint. The plaintiffs filed a response to the motion on January 29, 1975. On February 28, 1975, defendants filed a motion for summary judgment. The Court, Henley, C. J., denied the pending motions on March 6, 1975, and directed the parties to proceed with discovery with a view of a hearing on the new EIS. After the plaintiffs responded to interrogatories submitted by the defendants, the defendants, on July 11, 1975, filed a renewed motion for summary judgment.

Subsequently, the case was reassigned by the Honorable G. Thomas Eisele, C. J., to this Court, Harris, J.[6]

The Court scheduled a pre-trial hearing for August 12, 1975. The parties were directed to each file a "statement of issues."[7]

The Court scheduled a final hearing on the new EIS, filed by the Corps of Engineers, which commenced November 17 and continued through November 20, 1975. The Court took the matter under advisement and, by request, the parties were permitted to submit briefs as to their respective contention on the revised EIS submitted by the Corps.

In the meantime, the Arkansas Game and Fish Commission and the Cache River—Bayou DeView Improvement District and landowners have been permitted to intervene. The Court has had the benefit of excellent briefs filed by plaintiffs, Federal defendants and intervenors. In addition, the Special Assistant Attorney General, William G. Peterson, has been permitted to file amicus curiae brief on behalf of the State of Minnesota.[8]

---

6. Judge Henley had been nominated, confirmed and invested as a member of the Circuit Court of Appeals for the Eighth Circuit.

7. In transmitting "statement of issues" to the Court, the United States Attorney, on behalf of the defendants, called to the attention of the Court that no action had been taken on the pending motion for summary judgment, filed July 11, 1975. It was also contended that there was no issue as to the new EIS and that the plaintiffs were legally estopped from asserting all issues except one, which did not involve a

genuine issue. The Court reminded the United States Attorney that Judge Henley had previously denied the pending motions and directed the parties to enter into discovery proceedings.

8. The primary interest of the State of Minnesota is the impact which the proposed Cache River—Bayou DeView Channelization Project will have on mallards (ducks) of the Mississippi flyway and the adequacy of the Environmental Impact Statement in relation thereto.

**1086**

■ As pointed out in the opinion of the Circuit Court of Appeals, *Environmental Defense Fund, Inc. v. Froehlke,* supra:

"Section 102(C) of NEPA requires the Corps to '[i]nclude in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the human environment, a detailed statement' which discusses the impact of the action on the environment." p. 348

It must be in such detail as to meet the standards of the Act and sufficient to form a basis for responsible evaluation and criticism.

Section 102(C)(iii) of NEPA specifically requires that the impact study discuss "[a]lternatives to the proposed action." [9] Further, Section 102(G) of NEPA states that the Corps should "[i]nitiate and utilize ecological information in the planning and development of resource-oriented projects." And § 102(D) of NEPA mandates that the Corps:

"Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;"

With these requirements, as provided in the Environmental Policy Act of 1969, CEQ guidelines and the guidelines of the Corps of Engineers, the Court proceeds to determine, from the record, ore tenus testimony, numerous exhibits thereto, and briefs on behalf of the parties, as to whether the Corps has explicated "fully its course of inquiry, its analysis and its reasoning." *Ely v. Velde,* 451 F.2d 1130, 1139 (4th Cir. 1971). If this has been done, the revised EIS meets the requirement of the Act, the guidelines, and presents an accessible means for opening up the agency decision-making process and subjecting it to critical evaluation by those outside the agency, including the public.

Witnesses for the Government described, in some detail, the revised impact statement, received as exhibits in six volumes, composed of some twelve to fifteen hundred pages. The Corps' witnesses insisted that these six volumes composing the revised EIS, comply not only with the provisions of the Act, but, also, CEQ guidelines, the Corps guidelines and the directions in the opinion of the Circuit Court of Appeals in its remand.

Exhibits "1" and "1A" include a statement of the findings in the light of the overall public interest, the documents concerning the proposed action, the stated views of interested agencies of the Government, State agencies, and the concerned public, including practical alternatives in accomplishing objectives in providing flood control and maintaining environmental policy in the Cache River Basin. It contains such voluminous data that it would be neither practical or desirable to include in this opinion.[10]

Exhibit "1A", as explained by the Government witnesses, is a detailed description of coordination with others, including the public and Governmental agencies.

Exhibit "1B" of the revised EIS includes fish and wildlife mitigation plan, included in House Document No. 92–366, together with overall and detailed statement as to alternatives with pertinent documents, correspondence, evaluation of fish and wildlife, including tables and recommendations made from extensive surveys, tests and on-site observations.

Exhibits "1C", "1D" and "1E" include analyses from 1971 to early 1974, correspondence, statements and reports from various sources.

9. The opinion of the Circuit Court of Appeals, supra, outlined alternatives to the proposed project having been suggested by responsible critics, including State and Federal agencies, and private groups and individuals.

10. The several hundred pages in the exhibits describe the environmental impact, adverse environmental effects, alternatives in some detail, abandonment of the project and numerous comments from diverse sources, supported by photographs and plates of the various areas affected by the project.

The plaintiffs and others supporting their position contend that the EIS fails to assess cumulative effects with other projects and that the proposals for mitigation are so indefinite that there is no basis for constructive criticism. They state that as to certain items, such as the ground water table and changes in wildlife habitat, the EIS is devoid of a scientific basis for conclusory statements contained with regard thereto.

From a complete, objective review of the entire revised environmental impact statement, the Court is satisfied that the Corps of Engineers has attempted, in good faith, to satisfy the requirements of the Act, the guidelines of the Corps and of the Council on Environmental Quality, and has sought out and included recommendations and reports from other Federal agencies, State agencies, and members of the public with regard to any significant effects of the proposed project on the quality of the human environment.

The revised EIS discusses in great detail alternatives to the authorized project. In fact, there are over two hundred pages of discussion of alternatives summarized in Table 5–1, Volume "1" (Exhibit "1"). The testimony on the part of the plaintiffs described one specific alternative, leveed floodway and bypass channel, suggested by a representative of the Arkansas Game and Fish Commission. However, the testimony discloses that the suggestion was made orally, too late to be included, as the EIS was then substantially in its final printed form to be transmitted to the Secretary of the Army. It is noted that the statement includes discussion of two alternatives which were included as a result of the general comment made on the draft statement by one of the plaintiffs. Through this discussed alternative, the suggestion made orally, too late to be included in the statement, could virtually be accomplished in the execution of the authorized project.

There is nothing in the record, or shown by the testimony, that the mitigation features of the authorized plan cannot be accomplished. With the action already taken, there is no reason the acquisition of interest in approximately 70,000 acres of land cannot become a reality, nor is there any indication that defendants do not intend, in good faith, to carry out the mitigation features. On the contrary, defendants have already submitted a plan that will give a reasonable prospect of carrying out the mitigation land acquisition within the time and funding limits imposed by Congress. The District Engineer testified that he already has available funds and staff to accomplish approximately one-half of the proposed mitigation acquisition, and that he intends to use both forthwith if permitted to go forward with the project. The Congress has required by statute that not less than twenty percent of all funds allocated be expended for the acquisition of mitigation lands. It appears from the testimony that the Corps intends, in good faith, to spend substantially more than twenty percent of the funds appropriated in the early stages of the project.

Also, the plaintiffs complain that the impact statement does not discuss cumulative effects of the project on three aspects of the environment:

(1) the effect on mallard duck populations in the Mississippi flyway;

(2) the effect of the project on ground water; and

(3) the effect on downstream sedimentation and flooding.

The testimony was directed to a serious possibility that such cumulative effects might exist, merely because more than one project could be undertaken in the general area. Each of these complaints will be considered in accordance with the proof in the case as listed.

With reference to the alleged cumulative effects on mallard duck populations. The investigative method used by the Corps of Engineers in preparing the impact statement necessarily assessed the cumulative effects of all projects, Federal, State or private, which could have affected mallard duck populations for a period of twenty-five years prior to the issuance of the impact

statement. Particularly with respect to Eastern Arkansas—that part of the State conspicuously a part of the Mississippi flyway—the evidence gathered by the defendants shows that twenty-five years of construction of similar projects, which resulted in the draining, clearing and conversion to row crops of sixty percent of the pre-existing wetlands, had no detectable effect on duck population. This being so, there is no reason to suppose that the Cache River Project would have any great effect. This conclusion is one uncontradicted, except for a single attack by plaintiffs on the interpretation of original records of the Fish and Wildlife Service annual mid-winter duck counts. Plaintiffs would have the Court believe that the Fish and Wildlife Service, having divided Eastern Arkansas into certain established counting areas, examined some of those areas in some years, but not all of them in every year. There was no testimony presented on this question. It appears to the Court that there was an adequate, objective, scientific basis for the conclusions reached in the revised EIS.

With reference to the alleged cumulative effect on ground water. Plaintiffs complain that the United States Geological Survey completed a study of surface and ground water resources in an area including the Cache River Basin. The man in charge of that study testified for the plaintiffs to the effect that preliminary data were available, but that no conclusions could be reached from the study at the time of trial or earlier. He could not state a time when the study would be complete, but indicated that it would continue at least for a number of months. The defendants are not required to wait for the completion of that study. *Natural Resources Defense Council v. Callaway,* 524 F.2d 79 (1975). Furthermore, NEPA does not require that the defendants delay the publication of their impact statement to incorporate in it events which occur while the statement is in final stages of preparation and which could not have been foreseen. The reference is to the relaxation of acreage allotment controls for rice crops which occurred in the spring of 1974, it having been urged by plaintiffs that increased rice acreage will impose on ground water supplies increased demands for irrigation water. In the record, it does not appear that increased acreage allotments for rice are more than temporary, nor that increased acreage necessarily would be followed by increased ground water demands in any event. The impact statement discloses that defendants used competent personnel to make a careful study of the direct effect of the project on the ground water regimen as it was known to exist at the time the impact statement was prepared. That study showed only local effects on ground water, indicating that there could be no significant cumulative effects with other projects. In the absence of proof that the method used in this study was improper or that its results were not correct, NEPA requires no more.

With reference to the alleged cumulative effect on downstream flooding and sedimentation. Similarly, the defendants' study of downstream flooding and siltation indicated that project effects were so localized that there was little likelihood of any cumulative effect. This conclusion is uncontradicted. Again, it would serve no purpose for the environmental impact statement to contain a list of existing or proposed projects if there is no substantial likelihood that cumulative effects will exist.

The foregoing findings indicate that there is adequate scientific basis for the conclusions reached in the impact statement. This is not to say that those conclusions are beyond disagreement, nor indeed is it required that the conclusions of the impact statement satisfy all members of the scientific community, even if the members of that community could, among themselves, achieve unanimity. What is required is that the impact statement reveal those environmental problems which reasonable and qualified men believe will result from the project. The Court concludes these requirements have been met. It is not required that the environmental impact statement resolve differences of opinion, so long as the differences and the factual bases for the differences are exposed.

These are the major deficiencies in the EIS to which the testimony was directed. The voluminous information in great detail as to the total effect this project would have on these areas of the environment is suggestive that any other question that might be raised has similarly been dealt with in detail by the statement.

 As to the arbitrary and capricious issue. It is well established that an environmental impact statement need neither be perfect nor free of controversy in order to form a sufficient basis for an Executive or Congressional decision. It is also well settled that a decision made by the Executive or the Congress on the basis of adequate information—such as is presented in an acceptable EIS—will not be reexamined by the Courts. *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App. D.C. 393, 463 F.2d 783, 787 (1971); *Cape Henry Bird Club v. Laird*, 359 F.Supp. 404 (D.W.Va., 1973); *EDF v. Froehlke* (Gillham Dam), 470 F.2d 289 (C.A. 8, 1972); *Lathan v. Volpe*, 350 F.Supp. 362 (W.D.Wash., 1973); *Calvert Cliffs Coordinating Committee v. AEC*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).

As stated by Judge Eisele in *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army*, 342 F.Supp. 1211, 1216–17 (1972):

> "The judiciary can delay the construction of the . . . (project) pending compliance by the defendants with the congressionally mandated provisions of the NEPA but, ultimately, plaintiffs' only chance to stop the . . . (project), or to alter same, lies in their ability—perhaps with the aid of others—to convince the decision-makers of the wisdom and correctness of their views on the merits."

It is quite obvious that the Cache River decision-makers had all of the information in the final EIS when the decision to proceed was made. In fact, it is quite apparent from the record that they had much more besides. It would serve no purpose to recount here the array of academic and professional specialists that were involved in the preparation of the EIS, the several reviews of it, and in the actual decision to go forward with the project. It would unnecessarily extend this opinion. The EIS contains the obvious and extensive efforts made by the defendants to secure the advice and assistance of a sweeping array of outsiders, including the plaintiffs in the case, and the Secretary of the Army's environmental advisory board. The defendants were required to make an effective effort to secure the thoughts of everyone who had some responsible suggestion to offer. This was done which resulted finally with the decision in the Secretary of the Army. The Court cannot conclude from this record that the decision was either arbitrary or capricious.

The Court is satisfied that the new EIS meets the full disclosure requirement of the NEPA and produced a record upon which the decision-makers could arrive at an informed decision. The Court further concludes that the revised EIS is in accordance with the decision of Judge Eisele in the Cossatot case (*Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army*, supra), as well as with the Act, guidelines of CEQ and the Corps itself.

The defendants, having now complied with the law, are no longer acting ultra vires. The basis of the Court's jurisdiction has, therefore, been removed. The injunction will be vacated and the complaint dismissed.

The Court incorporates in this opinion findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Counsel for the Federal defendants will prepare an appropriate order in accordance with this opinion.