ENVIRONMENTAL DEFENSE FUND
and Thomas Burel Moser

v.

TENNESSEE VALLEY AUTHORITY.

Civ. A. No. 7720.

United States District Court,
E. D. Tennessee, N. D.

Oct. 25, 1973.

Judgment affirmed, 6 Cir., —— F.2d
——.

Jon T. Brown, Wallace L. Duncan, Duncan & Brown, Washington, D. C., Robert L. Echols, Nashville, Tenn., Lawrence R. Reno, Reno & Judd, Denver, Colo., Edward Lee Rogers, East Setauket, N. Y., Julian D. Butler, Butler & Potter, Huntsville, Ala., for plaintiffs.

Robert H. Marquis, Gen. Counsel, Tennessee Valley Authority, Legal Dept., Beauchamp E. Brogan, Beverly S. Burbage, Tennessee Valley Authority, Legal Dept., Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This action was commenced to enjoin the Tennessee Valley Authority from completing construction of the Tellico Dam Project. Plaintiffs allege violation of the National Environmental Policy Act,[1] the National Historic Preservation Act,[2] and the Federal Water Pollution Control Act Amendments of 1972.[3]

---

1. 42 U.S.C. § 4331 et seq. (hereafter referred to as NEPA).

2. 16 U.S.C. § 470f and Executive Order No. 11593.

3. 33 U.S.C. § 1323.

On January 11, 1972, this Court enjoined defendants from continuing further construction of the project. From September 17 through September 20, 1973, the trial on the merits was held. For the reasons indicated in the remainder of this opinion, we conclude that the preliminary injunction entered previously should be dissolved.

## I. *Background*

The general background of this litigation, the parties involved, and the history of the project are set forth in our memorandum of January 11, 1972.[4] This litigation stems from the construction of a concrete and earthfill dam near the mouth of the Little Tennessee River. TVA will ultimately acquire thirty-eight thousand acres for development of the project. Sixteen thousand, five hundred acres will be inundated upon completion of the reservoir; the remaining acreage will be developed for industrial, commercial, residential, and recreational purposes. The project plan also contemplates the creation of a new city, Timberlake, with a population of fifty thousand persons.

The project calls for the impoundment of the first thirty-three miles of the Little Tennessee River. The river and its environs present an extremely attractive setting, and are the source of thousands of annual fishing and boating trips. The area contains rich agricultural land with approximately twenty-five thousand, five hundred acres of the total acreage taken in land use Classes I, II, III. Fort Loudoun, an eighteenth century English fortification, is located on the south bank of the river. This historic site will be saved from inundation but will lose its river setting. Historically, the river bottomland is also important as the ancestral homeland of the Cherokee Indians. Several early Indian villages have been identified, including Chota and Citico and considerable archeological work has been underway for the past few years.

The Tellico Project is a multi-purpose water resource and regional development project. The reservoir and connecting canal with Fort Loudoun reservoir will serve to develop navigation, flood control, and electric power generation. Other direct benefits claimed by the project are recreational development, fish and wildlife use, water supply, shoreline development, and redevelopment. The project was first authorized by Congress on October 15, 1966. Construction on the concrete portion of the dam began March 7, 1967 and was completed on March 28, 1969. To date, $45,465,000 has been appropriated for the project, and over $35,000,000 has been spent. The current estimated project cost is $69,000,000.

## II. *National Environmental Policy Act*

Our original order granting a preliminary injunction against TVA was based on its failure to comply with NEPA. On February 10, 1972, TVA filed with the Council on Environmental Quality the final impact statement covering the Tellico Project. Plaintiffs contend that this statement is still deficient under sections 102(2)(C) and (D) of NEPA. Further, they argue that TVA has not complied with section 102(2)(B) of the Act and that the decision to proceed with the project was arbitrary and capricious.

### A. *Section 102(2)(C) of NEPA [42 U.S.C. § 4332(2)(C)]*

The final environmental impact statement comprises three volumes totaling approximately 600 pages. Volume I contains the final impact statement, the draft statement, agency and individual comments, and TVA's response thereto. Volume II gives supporting data for the material presented in the final statement. The final volume reproduces in full a critical report by a study group at The University of Tennessee dealing with TVA's economic analysis. TVA, in part 3 of this volume, responds to this report.

---

4. Environmental Defense Fund v. Tennessee Valley Auth., 339 F.Supp. 806 (D.C.1972).

Plaintiffs contend that the final EIS fails to discuss certain impacts of the project and inadequately discusses other impacts. Among the areas that plaintiffs argue are inadequately covered by the statement include the failure to contain a critical economic analysis; failure to discuss the cultural and historic impacts of the project; failure to discuss in detail the human impacts of family relocation; failure to discuss agricultural and related losses; failure to evaluate the uniqueness of the Little Tennessee River; and failure to discuss the shoreline development resulting from completion of the project. Plaintiffs also argue that several reasonable alternatives were not discussed in detail and that the EIS ignored discussion of the environmental impacts of the alternatives.

Section 102(2)(C) requires in part that all federal agencies shall—

"include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." [42 U.S.C. § 4332(2)(C)]

■■ An impact statement must discuss in detail the significant environmental impacts resulting from the proposed project. Environmental Defense Fund v. Corps of Eng. of United States Army, 348 F.Supp. 916, 933 (N.D.Miss. 1972); Sierra Club v. Froehlke, 359 F.

Supp. 1289 (S.D.Tex.1973). The EIS must be written so that it

" '. . . is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise.' The reason for this standard is that impact statements must assist in rational, thoroughly informed decision making by officials higher up in the agency chain-of-command, including the Congress, the Executive and the general public, some of whom may not possess the technical expertise of those who evaluate the impact and prepare environmental statements. . . ." Sierra Club v. Froehlke, 359 F.Supp. 1289, p. 1342 (S.D.Tex. 1973).

■ The alternatives available to a proposed action and their discussion should be searching. It is stated in Sierra Club v. Froehlke, supra, that:

"While agencies must consider alternatives to the 'fullest extent possible,' the search for appropriate alternatives need be neither 'exhaustive' nor speculative and remote. Although only those 'reasonably available' need be considered, the discussion and consideration cannot be superficial, but must be thoroughly explored . . ." at pg. 1344.

■ The fact that the Tellico Project was authorized and approximately one-half completed prior to the enactment of NEPA are factors which must be weighed in determining the scope of reasonable alternatives available to the project. Environmental Defense Fund v. Corps of Eng. United States Army, 470 F.2d 289 (8th Cir. 1972), cert. den., 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); Environmental Defense Fund v. Tennessee Val. Auth., 468 F.2d 1164, 1179 (6th Cir. 1972).

### 1. Historical and Archeological Discussion

Testimony at trial for plaintiffs attacked the sufficiency of the statement's

treatment of the historical and archeological loss to be incurred by completion of the project. Two sections in the body of the final impact statement deal with these impacts [5] and a supplemental section further details the discussion.[6]

Plaintiffs' witness stated that the project area is the most important archeologically in Tennessee. It was his opinion that the EIS minimized this importance. The most significant impacts in this regard will be the inundation of several Indian villages built during the occupation of the region by the Cherokee and other earlier peoples. Similarly, Fort Loudoun, an eighteenth century English fortification, will be disjoined from its historic setting by the resulting reservoir.

The impact statement recognizes that the area is of considerable archeological value and that to some degree these values will be adversely affected by the project.[7] TVA has, as is noted in the statement, initiated and financed archeological teams to survey the area.[8] Already more than five hundred thousand artifacts have been unearthed. Chota, a recently identified Cherokee village, will be preserved through filling.[9] Fort Loudoun will be likewise preserved, but it will lose its river setting.

Three nationally known archeologists have reviewed the statement's treatment of this topic and feel the discussion is adequate.[10] Dr. Guthe of the University of Tennessee, who is in charge of the salvage surveys and excavations of the area, testified that he has reviewed the EIS and feels that it contains an objective detailed discussion of the significant impacts of the project concerning this topic. The controversy in this area

concerned the emphasis to be placed on the loss. Little evidence was presented demonstrating a lack of disclosure on the part of TVA or a lack of objective analysis of the loss. We find the impact statement's discussion of the historical and archeological impact resulting from the project to be adequate.

### 2. *Family Relocation*

Plaintiffs challenged the adequacy of the statement's discussion of the impact resulting from family relocation. One section of the EIS covers this topic.[11] About two hundred and seventy-five families are affected by the project. A substantial portion of these have already relocated. Although the statement recognizes the unfortunate aspect of family upheaval, discussion is limited to the financial compensation available through present federal legislation.

The significance of the impact cannot be denied, but plaintiffs provided little proof on how the quality of the discussion could have been improved.[12] The practicality of sociological studies with the time limitations of drafting an impact statement is questionable. Considering the nature of the subject, this Court finds that the treatment given in the EIS is adequate.

### 3. *Ecological Discussion*

Two witnesses testified concerning the statement's alleged deficiencies in what may broadly be labeled the area of ecological impacts. Mr. Price Wilkins of the Tennessee Game and Fish Commission concentrated on the disclosure relating to trout fishing. By his affidavit and testimony he questioned TVA's evaluation of the nature of trout fishing on

---

5. I–1–8 through 9; I–1–35 through 38.

6. II–9–1 through 5.

7. I–1–42; I–1–48.

8. Archeological work has been underway since around 1967.

9. The statement only reflects TVA's willingness to undertake this project. At trial evidence presented by defendants revealed that

the village will be at least partially preserved.

10. Exhibit No. 104.

11. I–1–35.

12. Plaintiffs' proof consisted primarily of the testimony of Mr. Clebsch whose expertise was in the field of biology. His testimony did little more than highlight the topic and note the significance of the problem.

the river and criticized the statement's failure to analyze the uniqueness of the Little Tennessee River. Dr. Clebsch, a biologist at The University of Tennessee, noted the failure to conduct a more thorough eco-system analysis. He felt that only the beginning of such an analysis was reflected in the statement, and although a complete eco-system analysis would take at least three man years, a more detailed study could have been performed.

Dr. Frank R. Holland, a TVA employee and the official responsible for much of the discussion on the subject in the EIS, contradicted the testimony of both Mr. Wilkins and Dr. Clebsch. He stated that the more exotic eco-system analyses were of little benefit to the layman and not necessary within the scope of an impact statement. The discussion provided by the statement, he felt, was adequate to identify the impacts of the project.

The effect of the project on fishing is covered in several sections of the EIS.[13] We find this discussion adequate under NEPA. With the exception of a few minor objections, Mr. Wilkins' testimony did not really challenge the overall accuracy of the predictions made by TVA. The treatment given the other ecological impacts is also adequate.[14] Although more detailed studies could have been performed, we believe that the material presented was sufficient to alert an expert to the potential impacts.

#### 4. Water Quality

Dr. Thackston, a member of Governor Dunn's staff, testified for plaintiffs concerning the statement's treatment of the water quality changes that will occur as a result of the project. He found that there was an abundance of data on existing water conditions, but that the statement with one exception was deficient in predicting future water quality.

Ten areas were pointed out, the discussion of which he felt would have made the EIS adequate.

Dr. Krenkel of Vanderbilt University and Mr. M. A. Churchill, a water quality specialist for TVA, appeared for defendants and contradicted Dr. Thackston's opinion that the coverage was inadequate. Mr. Churchill pointed out that the water quality aspects of the impact statement were reviewed by Dr. Abel Wolman of John Hopkins University and Dr. Robert L. Ball, Director, Office for Research Development, Institute of Water Research, Michigan State University.

No other topic received the attention, at least quantitatively, as did the water quality aspects of the project. Besides the discussion in the body of the impact statement,[15] the bulk of volume II contains supplementary material.[16] We do not find the failure to predict the areas outlined by Dr. Thackston fatal to the analysis of the topic. Some of the points raised by Dr. Thackston were discussed although the methodology used to reach the conclusions was absent. Mr. Churchill testified that many of the areas were difficult to accurately predict, and the preparation would be time-consuming.

The discussion of water quality is sufficient for the purpose of an impact statement, and, although the inclusion of more detailed studies would be of some benefit to a select group of readers, they were not necessary to satisfy NEPA.

#### 5. Shoreline Development

In memorandum of January 11, 1972, this Court found TVA's twenty-seven page draft statement deficient under NEPA. Citing two statements from the draft EIS dealing with shoreline development, we stated:

"Since these statements concerned the long-range recreational, residential and industrial development of the

---

13. I–1–6 through 8; I–1–14 through 20; II–11–1 through 34; II–12–1.

14. I–1–6 through 42; I–3–89 through 91; I–4–20 through 29; II–12–1 through 24.

15. I–1–28 through 31.

16. II–2–1 through 31; II–3–1 through 34; II–4–1 through 6; II–5–1 through 4; II–6–1 through 34.

area, they show a failure to consider the long-range environmental impact of the project on the area." Environmental Defense Fund v. Tennessee Valley Auth., D.C., 339 F.Supp. 806, 809.

Plaintiffs contend that the final impact statement's treatment of this topic is virtually identical, and, therefore, prima facie inadequate. In the impact statement, TVA admits that they cannot determine at this time the exact industries which will locate on the shores of the Tellico Reservoir. It is anticipated that a future supplemental statement will be necessary when plans become more concrete. Defendants deny that the discussions in the draft and final statements are identical and give numerous page citations.

■ Undoubtedly, in a project of this nature an agency must within limits predict the effect that the development of the shoreline will have on the environment. Sierra Club v. Froehlke, 359 F.Supp. 1289 (W.D.Tex.1973); 36 Fed. Reg. 7725. After examining the final EIS, this Court finds that the treatment afforded this topic has been expanded from that in the draft statement and represents, as far as practicable at the time the statement was filed, a detailed discussion.

It is true, as plaintiffs assert, that the identical language from the draft statement appears in the final EIS. Nevertheless, a good deal of additional information is ignored by them. The redundant language occurs on page I–1–33 of the EIS. Additional discussion occurs in numerous other sections of the statement.[17] On pages I–1–29 through I–1–30 and I–1–34 through I–1–35, the effects of the development on air and water quality are discussed. Other impacts resulting from development of the shoreline around the project are outlined in the statement. An arrangement with the State of Tennessee whereby the Tennessee State Planning Commission will assist in planning for development is pointed out. Pursuant to this arrangement, the Tellico Area Planning Council was formed, and issued a report adopting a long-range land-use plan. Also, a three-part comprehensive land-use plan was prepared 'for and adopted by the three counties in which the project is located.[18]

Several of the plaintiffs' witnesses testified that what occurs in the way of development on the shores of Tellico will have an integral effect on the entire realm of environmental impacts in the area. However, witnesses for defendants stated that with respect to air and water quality there exists sufficient federal, state and local standards to keep harmful impacts to a minimum.

■ NEPA requires a certain amount of prediction; it does not call for utter conjecture when with the passage of time a supplement can be provided.[19] The disclosure presented is ample under NEPA.

### 6. Economic Analysis

Much of plaintiffs' proof centered on the economic aspects of the project. Previously, this Court noted the necessity of setting out the methodology used to determine the benefit-cost ratio.[20] Under the full disclosure requirements of NEPA this data would be informative to members of Congress, federal agencies, and the public in fully evaluating the effects of the project. Cape Henry Bird Club v. Laird, 359 F.Supp. 404 (E. D.Va.1973). Plaintiffs claim that the final EIS still fails to contain such information.

---

17. I–1–2 through 3; I–1–5 through 6; I–1–24 through 25; I–1–39 through 35; I–1–42; I–1–43; I–1–48; I–3–26 through 27; I–3–38; I–3–81 through 83; I–3–87 through 88; I–3–92 through 93; I–3–104; II–1–27.

18. I–3–81; Ex. 110; I–1–5; Ex. 112; II–1–27; Exs. 113, 114.

19. Environmental Defense Fund v. Tennessee Val. Auth., 468 F.2d 1164, 1182 (6th Cir. 1972).

20. Environmental Defense Fund v. Tennessee Valley Auth., 339 F.Supp. 806 (E.D.Tenn. 1972).

We can scarcely imagine a more satisfactory disclosure than that contained in final statement. Beside the summary of economic information [21] and responses to comments, the entire third volume presents detailed economic discussion of the project both pro and con. A study entitled the *Tennessee Valley Authority's Tellico Project: A Reappraisal* is reprinted in full. This one hundred and six page document was prepared by a group of faculty members and students at The University of Tennessee. It investigated three economic aspects of the Tellico Project with emphasis on the method of estimating the flow of benefits and costs resulting from the investment. TVA in the final part of the statement responded to this study. Plaintiffs at trial relied on many of the contentions raised in the report. The treatment afforded the economic aspects of the project in the EIS more than suffices the disclosure requirements of Section 102(2)(C) of NEPA.[22]

### 7. *Alternatives*

■ Under Section 102(2)(D) of NEPA federal agencies are required to:

". . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

The District of Columbia Circuit has stated that:

". . . This requirement, like the 'detailed statement' requirement, seeks to insure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in

that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made . . . ." Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

As noted previously, only those alternatives reasonably available need be considered, and the extent of completion is a factor limiting the breadth of alternatives.

Plaintiffs contend that defendants did not consider in detail in the EIS such reasonable alternatives as flood plain zoning, flood insurance, levees in Chattanooga, industrial sites in Florence, Alabama, several "low dam" alternatives, a scenic river proposal such as that developed by the State of Tennessee, abandonment of the project, and other similar alternatives. Additionally, they contend that the impacts of the alternatives have not been discussed in the final statement and cite Natural Resources Defense Council v. Morton, 148 U.S. App.D.C. 5, 458 F.2d 827, 834 (1972); CEQ Guidelines, 36 Fed.Reg. 7725, para. 6 (IV) and 38 Fed.Reg. 20554, sec. 1500.8, para. (a)(4) in support of the inclusion of this material.

The alternatives to the project are discussed on pages I–1–43 through I–1–47.[23] The analysis of alternatives to the project in the EIS, TVA states, involves to some degree means of achieving comparable benefits through alternative means. Comparing the projected benefits to be gained by the Tellico project such as recreation, electric power, flood control, etc., with various alternatives, the impact statement concludes that no alternative is better than the project as designed.

■ Limiting alternatives and discussion purely to those that provide com-

---

21. I–1–49.

22. The more difficult issue raised in this regard is discussed under section C of this opinion, *infra*. This concerns the extent, if any, this Court must delve into the various economic arguments surrounding the compu-

tation of the B/C ratio to determine if they reflect arbitrariness in TVA's basic decision to proceed with the project.

23. TVA also responds to alternatives raised by those commenting in part 3 of Volume 1 (e. g. I–3–42 through 51).

mensurate economic benefits, as the proposed action, would not conform with the requirements of NEPA. Environmental values are to be given appropriate consideration along with economic and technical considerations. Section 102(2)(B) of NEPA.[24] The impact statement in this case, although dwelling on economic factors, also describes alternatives to the project and evaluates their environmental costs and benefits.

A number of alternatives to the project are discussed, including abandonment of the project development as a river rather than a lake, the construction of one or more low dams, and alternative locations. The absence of discussion of nonstructural alternatives to the project such as flood plain zoning, flood insurance, and levees in Chattanooga is not fatal to the analysis since testimony by witnesses for defendants demonstrated that these alternatives could not provide complete protection.

Discussion of the impacts of the alternatives although not definitive is sufficient to satisfy NEPA. The alternative of abandoning the project is quite detailed. In the body of the impact statement, TVA discussed the impact of the project and parallels this with a discussion of the impact absent the project.[25] Other alternatives do not receive this amount of treatment.[26] The statement as a whole does give sufficient information concerning all reasonable alternatives for evaluation of their relative merits.

### 8. *Agency Comment*

Plaintiffs contend that defendants failed to circulate the draft and final EIS to all interested parties and failed to respond in adequate detail to comments of other agencies. Section 102(2)(C) provides in part that:

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and view of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes; . . . ."

Factually, there is no basis for plaintiffs' contention. Part 3 and 4 of the first volume of the EIS contain agency and individual comments and TVA's response thereto. Plaintiffs failed to demonstrate at trial any effort on the part of TVA to deny access of the statement to any private organization. Similarly, we find TVA's response to agency and individual comments adequate.

B. *Section 102(2)(B) of NEPA [42 U. S.C. § 4332(2)(B)]*

Section 102(2)(B) of NEPA requires that, to the fullest extent possible, all federal agencies shall:

" . . . identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act [42 U.S.C. §§ 4341–4347], which will insure that presently unqualified environmental amenities and values may be given appropriate consideration in decisionmaking along the economic and technical considerations; . . . ."

Plaintiffs urge that the testimony at trial and TVA's regulations[27] reflect that some three and one-half years after enactment of NEPA this requirement has not been satisfied. Plaintiffs assert that the testimony of Dr. Roberts establishes that procedures can be developed

---

24. 42 U.S.C. § 4332(2)(B).

25. I–1–15; I–1–21; I–1–23.

26. I–1–46.

27. 36 Fed.Reg. 21010.

for quantification of environmental values, just as procedures for quantification of recreational benefits have been developed.

 Under 33 U.S.C. § 701 and Senate Document No. 97 benefits can be claimed by an agency of values which can be characterized as environmental.[28] However, nowhere in Section 102(2)(B) is an agency required to compute in dollar figures every environmental loss. This section merely requires *methods and procedures* be developed for *appropriate consideration* of presently unquantified amenities, not the development of a procedure of mathematical equivalence as urged by plaintiffs. This is not to say that if methods exist for more exact evaluation of environmental losses an agency need not adopt them.

### C. *Sections 101 and 102 of NEPA* [*42 U.S.C. §§ 4331 and 4332*]

 The Sixth Circuit Court of Appeals in their order affirming our issuance of a preliminary injunction in this case emphasized that:

" . . . we intimate no opinion on the question of the advisability of proceeding with the project *or on the question whether plaintiffs may challenge, under the NEPA, the ultimate decision to proceed.*"[29] (Emphasis added)

This Court, therefore, must decide whether NEPA gives plaintiffs the right to challenge the decision to continue with the project as designated. We conclude that it does.

After initially limiting review to an agency's procedural compliance, several circuits began recognizing the right of plaintiffs within limits to attack the underlying decision.[30] A leading case, acknowledging this right and defining the standard of judicial review, is Environ-

mental Defense Fund v. Corps of Eng., United States Army, 470 F.2d 289 (8th Cir. 1972). There the Court held that:

"When NEPA is involved, the reviewing court must first determine if the agency reached its decision after a full, good faith consideration and balancing of environmental factors. *The Court must then determine, according to the standards set forth in §§ 101(b) and 102(1) of the Act, whether 'the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values.'* [Citing Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971)]." (Emphasis added) at pg. 300.

The Court cautioned that:

" . . . although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. [Citing, Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)]."

It is evident from the testimony presented by plaintiffs that they construe the scope of review to include a complete inquiry into every aspect of the decision to proceed with special emphasis on the defendants' computation of the benefit-cost analysis. Indeed, by far the greatest amount of testimony on any single topic was given to the debate of the relative economic contentions of the parties. Plaintiffs' witness, Dr. Joseph Carroll, testified that the claimed navigation and flood control benefits and their method of calculation was arbitrary. Plaintiffs' second expert in this area, Dr. Paul E. Roberts, testified to an assortment of economic matters.

---

28. We have assumed for purposes of this memorandum that TVA is bound by this document.

29. Environmental Defense Fund v. Tennessee Val. Auth., 468 F.2d 1164, 1181 (6th Cir. 1972).

30. Environmental Defense Fund v. Corps of Eng., U. S. Army, 470 F.2d 289 (8th Cir. 1972); Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir. 1972); Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 (4th Cir. 1973).

It is defendants' contention that an agency determination of the economic benefits and costs of a project under the Flood Control Act of 1936 or Senate Document No. 97, as opposed to environmental costs and benefits under NEPA, is a legislative function not subject to judicial review. Alternatively, they state that assuming review is possible, plaintiffs' economic contentions are easily disposed of on the evidence produced at trial.

Calculation of the B/C ratio required under the Flood Control Act of 1936 and Senate Document No. 97 has almost uniformly been denied judicial review. United States v. West Virginia Power Co., 122 F.2d 733 (4th Cir. 1941), cert. den., 314 U.S. 683, 62 S.Ct. 187, 86 L.Ed. 547 (1941); Environmental Defense Fund v. Corps of Eng. of U. S. Army, 325 F.Supp. 728 (E.D.Ark.1970), aff'd, 470 F.2d 289 (8th Cir. 1972), cert. den., 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir. 1973); Environmental Defense Fund v. Corps of Eng. of United States Army, 348 F.Supp. 916, 924 (N.D.Miss. 1972); Cape Henry Bird Club v. Laird, 359 F.Supp. 404 (W.D.Va.1973); *contra,* Montgomery v. Ellis et al., 364 F.Supp. 517 (N.D.Ala.1973).

▆ We do not view the test enunciated by the Eighth Circuit as encompassing a complete review of all economic factors involved in a project. Matters such as the projected electric power benefits, flood control benefits, etc. and whether their computation conforms to the requirements of Senate Document No. 97 are legislative matters and not reviewable.[31] Although in denying review of the economic computations under Title 33 U.S.C. § 701, we note, as did the Eighth Circuit in Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 356 (8th Cir. 1972), that partial review is available under NEPA. In order to fully comply an agency "must reappraise the costs and benefits of the project *in light of the policies of environmental protection found in NEPA.*" (Emphasis added). Hence, any environmental benefits claimed by an agency may be scrutinized by this Court as it reflects upon whether the costs and benefits struck were arbitrary according to the standards set forth in sections 101 and 102 of NEPA.

▆ We have examined the testimony and exhibits presented in this case along with the arguments propounded by both parties and conclude that defendants' decision to proceed was not arbitrary. In reaching this conclusion, this Court is mindful of the narrow scope of its review. We have also taken into consideration that the project was authorized several years prior to the passage of NEPA, and almost $35,000,000 has been expended on the project. Environ-

---

31. Dr. Roberts' testimony concerned almost exclusively matters that we find unreviewable under NEPA. He stated *inter alia* that the project benefits and costs, the discount rate, project life and secondary benefits were all arbitrarily calculated. As said in Environmental Defense Fund v. Corps of Eng. of United States Army, D.C., 325 F. Supp. 728:

"... It is for the Congress to determine, in authorizing such a project and in, thereafter, making subsequent appropriations therefor, whether the benefits are 'in excess of the estimated costs.' The Court does not believe that it has the authority to enjoin the expenditure of appropriated funds upon a showing that the benefits are less than the estimated cost . . .

\* \* \* \* \*

"... The methods of calculating cost-benefit ratios are innumerable and in many cases esoteric. The Court's judgment as to sound procedures in this regard might well not be in accord with the judgment of Congress. And, as stated above, the Court does not believe it should, in any event, attempt to substitute its judgment for that of the legislature."

We reject plaintiffs attempt to revive review of these matters by way of NEPA's substantive review process. Cape Henry Bird Club v. Laird, 359 F.Supp. 404 (W.D. Va.1973).

mental Defense Fund v. Corps of Eng., United States Army, 470 F.2d 289, 301 (8th Cir. 1972).

## II. *Miscellaneous Claims*

■ At trial, plaintiff abandoned their claim that TVA has failed to comply with Title 16 U.S.C. § 469a. The only question remaining is whether defendants have complied with Title 16 U.S.C. § 470f and Executive Order No. 11593. Both the EIS and the evidence show that TVA is in full compliance with this Act. As to the Indian villages nominated on August 30, 1973 for inclusion in the National Register, TVA has not yet had the opportunity to comply with the Act but stated at trial it fully intended to do so. Similarly, plaintiffs claim under the Federal Water Pollution Control Act Amendments of 1972 is without merit. We feel that this Act has no application under the facts of this case.

### *Summary*

■ In dissolving the injunction against proceeding with the Tellico project, we have found that TVA has now complied with NEPA. The final impact statement discloses the significant impacts to result from the project and discusses the reasonable alternatives available.[32] There has been on the part of TVA in reaching its decision a good faith consideration and balancing of environmental factors. An attempt has been made to mitigate certain of the environmental losses inherent in proceeding with the project. Further, we have concluded that according to the standards set forth in sections 101(b) and 102(1) of NEPA the actual balance of costs and benefits struck was not arbitrary and gave sufficient weight to environmental values. The Tellico project has engendered a great deal of controversy. However, this Court cannot substitute its judgment for that of TVA as to the wisdom of proceeding with a pro-

ject in which almost one-half of the funds have been appropriated. As we have outlined previously, our review is considerably more limited.

---

32. About $140,000 has been expended in preparing the final EIS.