**Hiram G. HILL, Jr. et al.**

v.

**TENNESSEE VALLEY AUTHORITY.**

Civ. No. 3-76-48.

United States District Court,
E. D. Tennessee, N. D.

May 25, 1976.

754

W. P. Boone Dougherty, Knoxville, Tenn., for plaintiffs.

Herbert S. Sanger, Jr., General Counsel, Charles A. Wagner III, Associate General Counsel, Thomas A. Pedersen and Nicholas A. Della Volpe, Knoxville, Tenn., for defendant Tennessee Valley Authority.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiffs, The Association of Southeastern Biologists, the Audubon Council of Tennessee, Inc., Hiram G. Hill, Jr., Zygmunt J. B. Plater and Donald S. Cohen, seek to enjoin the completion of the Tellico Dam and consequent impoundment of the Little Tennessee River. Plaintiffs allege that defendant Tennessee Valley Authority [TVA], a wholly-owned corporation of the United States, is acting in violation of the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq., by bulldozing and clear-cutting trees and foliage along the banks of the Little Tennessee River and by proceeding with plans to impound the river in January 1977.

Specifically, plaintiffs contend that TVA has violated § 7 of the Act (16 U.S.C. § 1536), which provides as follows:

"*Interagency cooperation*

"The Secretary [of the Interior] shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal departments and agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with the affected States, to be critical."

Additionally, plaintiffs allege that TVA is acting in violation of § 9 of the Act (16 U.S.C. § 1538) which provides, in pertinent part, as follows:

"*Prohibited acts—Generally*

"(a)(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

\*　　\*　　\*　　\*　　\*　　\*

"(B) take any such species within the United States or the territorial sea of the United States;"

Section 1532(14) states as follows:

"(14) the term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."

*See also* § 1532(8).

On February 25, 1976, the Court denied defendant's motion to dismiss the complaint and denied plaintiffs' motion for a preliminary injunction prohibiting further work on the Tellico Project. Trial on the merits was held April 29 and 30 and at the conclusion of the evidence and arguments of counsel, both sides were given ten days to submit post-trial briefs.

■ Although six issues are set forth in the pre-trial order, the controlling ones in our judgment are as follows:

(1) Whether closure of the Tellico Dam and consequent creation of the Tellico reservoir will jeopardize the continued existence of the snail darter or destroy or modify the critical habitat thereof; and

(2) Whether the Endangered Species Act of 1973 requires that an injunction issue preventing completion of the Tellico Project.

For the reasons hereafter stated, we have concluded that the answer to the first issue is in the affirmative [1] and the answer to the other one is in the negative.[2]

This controversy centers around a small, tannish-colored fish which is commonly known as the snail darter. Its name derives from the fact that it feeds primarily on small snails along the river bottom. It was discovered on August 12, 1973 by Dr. David A. Etnier, an ichthyologist and assistant professor of zoology at the University of Tennessee. Dr. Etnier discovered this new and distinct species at or near a place called Coytee Springs at approximately river mile 7 of the Little Tennessee River.[3] The snail darter, a member of the perch family, was scientifically described as *Perci-*

1. In light of this conclusion, we do not deem it necessary to decide whether defendant's activities constitute an illegal "taking" of the species in violation of § 9 of the Act. *See* 16 U.S.C. § 1538(a)(1)(B); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1301 (8th Cir. 1976).

2. Since this case involves novel questions of law, about which there may be differences of

opinion, fairly detailed factual findings have been made despite the conclusion that the Act should not be construed as preventing completion of the project.

3. Exhibit 2 is a map of the Tellico Project. All references to specific river miles are taken from it.

*na (Imostoma) tanasi* by Dr. Etnier in the *Proceedings of the Biological Society of Washington,* Vol. 88, No. 44, pp. 469–488 (January 22, 1976).

■ On January 20, 1975 several persons, including plaintiffs Hill and Plater, petitioned the Secretary of the Department of Interior to list the snail darter as an endangered species pursuant to § 1533 of the Act. Thereafter, the Secretary invited interested persons, including TVA, to comment on a proposed rule-making to that effect. Although TVA and others objected to the proposal, the snail darter was placed on the endangered species list, effective November 10, 1975, on the ground that there was a present or threatened destruction of the snail darter or its habitat. *See* 16 U.S.C. § 1533(a)(1)(1); 50 C.F.R. § 17.11(i) (1975); 40 Fed.Reg. 47505–47506 (1975). In listing the snail darter as an endangered species, the Director of the Fish and Wildlife Service of the Department of the Interior noted that

> "In [the area between river miles .4 and 17 of the Little Tennessee River] the snail darter occurs only in the swifter portions of shoals over clean gravel substrate in cool, low-turbidity water. Food of the snail darter is almost exclusively snails which require a clean gravel substrate for their survival. The proposed impoundment of water behind the proposed Tellico Dam would result in total destruction of the snail darter's habitat." 40 Fed.Reg. at 47506.

On or about October 20, 1975 plaintiffs notified the Department of Interior and TVA that further implementation of the Tellico Project would violate § 7 of the Act. This lawsuit was filed February 18, 1976.

On April, 1976, the United States Fish and Wildlife Service of the Department of the Interior designated river miles .5 to 17 as "critical habitat" for the snail darter,

effective May 3, 1976. 41 Fed.Reg. 13926– 13928 (1976). *See* 50 C.F.R. § 17.81 (1976).[4]

The evidence introduced at trial showed that the snail darter requires for its survival a clear, gravel substrate, in a large-to-medium, flowing river. The snail darter has a fairly high requirement for oxygen and since it tends to exist in the bottom of the river, the flowing water provides the necessary oxygen at greater depths. Reservoirs, unlike flowing rivers, tend to have a low oxygen content at greater depths.

Reservoirs also tend to have more silt on the bottom than flowing rivers, and this factor, combined with the lower oxygen content, would make it highly probable that snail darter eggs would smother in such an environment. Furthermore, the adult snail darters would probably find this type of reservoir environment unsuitable for spawning.

Another factor that would tend to make a reservoir habitat unsuitable for snail darters is that their primary source of food, snails, probably would not survive in such an environment.

Although TVA introduced evidence that about a dozen snail darters have been found outside of the critical habitat area and 50 or 60 of the species have been sighted at river miles .2 to .3, this does not alter the fact that river miles .5 to 17 of the Little Tennessee River constitutes a significant portion of the snail darter's range and is a critical habitat for the species.

It was undisputed at trial that the best estimates of the snail darter population are 10,000 to 15,000 and that this population is presently in the critical habitat area. All of the portion of the Little Tennessee River which is presently designated as critical habitat area will be inundated by the waters of the Tellico Reservoir, and the water depth at Coytee Springs, the place of the snail darter's discovery, will increase

4. On April 22, 1975, the Department of Interior published its interpretation of "critical habitat" as it relates to § 7 of the Endangered Species Act. 40 Fed.Reg. 17764–17765. This interpretation states, *inter alia,* that critical habitat

"could be the entire habitat or any portion thereof, if, and only if, any constituent element is necessary to the normal needs or survival of that species."

from its present depth of two or three feet to a depth of thirty or forty feet.

Although the snail darter may continue to exist for several years after the proposed impoundment, it is highly doubtful that it would reproduce in a reservoir environment. We conclude, therefore, that the preponderance of the evidence demonstrates that closure of the Tellico Dam in January 1977 and the consequent creation of the Tellico Reservoir will result in the adverse modification, if not complete destruction, of the snail darter's critical habitat.[5]

As part of the program to conserve the snail darter, TVA has transplanted over 700 of the species to the Hiwassee River, which provides a habitat similar to that of the Little Tennessee. The evidence showed, however, that the transplant may or may not be successful since there is no conclusive proof that the 700 snail darters will reproduce in their new environment. Chances of reproduction in the new environment are slight according to Dr. Etnier.

As stated previously, TVA scientists have sighted 50 or 60 of the snail darters just downstream of the concrete portion of the dam at river miles .2 to .3. Also, 8 or 10 of the species have been sighted downstream from the mouth of the Little Tennessee River in Watts Bar Reservoir, including sightings at 4 and 10 miles downstream.

A TVA diver made what he termed a positive identification of two snail darters in the Chickamauga Reservoir below Watts Bar Dam and at a point some 85 river miles downstream from the mouth of the Little Tennessee. No specimens have been collected from the Chickamauga Reservoir, however, and the visibility conditions were poor when the sighting was made.[6]

TVA has searched unsuccessfully in 60 or 70 other watercourses in Alabama and Tennessee looking for other populations of snail darters. It has also unsuccessfully searched the upper reaches of the Little Tennessee River (river miles 18 to 33) in search of the darter.

In light of the fact that so few of the species have been found in places other than the critical habitat area, we conclude that it is highly probable that closure of the Tellico Dam and the consequent impoundment of the river behind it will jeopardize the continued existence of the snail darter. Almost all of the known population of snail darters will be significantly reduced if not completely extirpated, either due to the impoundment itself or the snail darter's potential loss of reproductive ability if it is unable to adapt to a new environment.

In a letter dated April 27, 1976 from Assistant Secretary Reed of the Department of the Interior addressed to Professor Plater, the following was stated:

"Recent assertions that the snail darter exists elsewhere than in that portion of the Little Tennessee River declared to be critical habitat do nothing to change the [Fish and Wildlife] Service's position. The biological evidence remains that if the Little Tennessee River is impounded by Tellico Dam, the continued existence of the snail darter will be jeopardized and its critical habitat destroyed." Exhibit 33, p. 3.

The evidence shows that TVA has made a good faith effort to conserve the snail darter while carrying out its plans to complete

---

**5.** TVA concedes that a significant portion of the snail darter's presently known habitat will be altered or modified by the impoundment, but it denies that impoundment will result in total destruction of the snail darter. TVA's Trial Brief at 2. The Secretary of the Department of the Interior has indicated that a federal action affecting critical habitat would not comply with § 7 of the Act

"if such an action might be expected to result in a reduction in the number or distribution of [the] species of sufficient magnitude to place the species in further jeopardy, or restrict the potential and reasonable expansion or recovery of that species." 40 Fed.Reg. 17764–17765 (April 22, 1975).

**6.** The diver testified that he was at a depth of about 15′ when the sighting occurred and visibility was 3′ to 4′. He further testified that the total time elapsed during the sighting was about 15 seconds. Although the diver was not a trained ichthyologist, he was familiar with the snail darter's appearance.

the project. In December 1973, Dr. Etnier submitted a research proposal to TVA, requesting that it fund a biological study of the snail darter, including its life history and habitat. Dr. Etnier suggested that it might be possible to transplant the snail darter to other suitable river habitats, including the Hiwassee which he described as "the site most similar to the Little Tennessee River . . . ." TVA concluded that such a program would be worthwhile, and contracted to fund a study by the University of Tennessee. Mr. Wayne Starnes, a graduate research assistant, undertook the study, which is still in the process of completion.

TVA undertook its own program in June 1975 to scientifically study the snail darter, attempt transplantation and search for new populations. TVA employs its own biologists in this study and has enlisted the assistance of outside consultants. The record shows that TVA has communicated frequently with the Fish and Wildlife Service and the State Wildlife Resources Agency about the snail darter. Several meetings have also been held with these agencies on the subject of the snail darter and its conservation.

Plaintiffs contend that TVA has not properly "consult[ed]" with the Department of Interior within the meaning of that term as used in § 7 of the Act. It is asserted that TVA has never seriously considered alternatives to completing the dam and impounding the river. Assuming this to be true, it is understandable why TVA might take such a course of action. Completion of the dam and impoundment of the river are integral parts of a project begun almost a decade ago. TVA has been moving toward this goal since ground was first broken. When the snail darter was listed on the endangered species list in November 1975, TVA was fairly close to completion of the project which has been consistently funded by Congress since 1966.

The nature of the project is such that there are no alternatives to impoundment of the reservoir, short of scrapping the entire project. Modifications or alterations to the project cannot be made at this time which will insure compliance with the Endangered Species Act. Requiring TVA to consult with other agencies about alternatives not reasonably available to it would be to require TVA to perform a useless gesture.

TVA has continued work on the project under the supervision and direction of Congress. During congressional appropriation hearings involving the project, held in April and May 1975, TVA informed both the House and Senate committees that the snail darter had been discovered; that TVA did not construe the Endangered Species Act as preventing the completion of the project; that TVA believed the environmental consequences of the project had been fully disclosed;[7] and that TVA was attempting to preserve the darter but that the project should be completed in any event. *Hearings Before a Subcomm. of the House Comm. on Appropriations*, 94th Cong., 1st Sess., Pt. 7, at 467 (1976); *Senate Hearings Before the Comm. on Appropriations*, 94th Cong., 1st Sess., Pt. 4 at 3775–77 (1975).

After being so advised through its committees, Congress appropriated over $29 million for the project through September 1976. The appropriation bill was signed into law by the President on December 27, 1975—more than a month after the snail darter was placed on the endangered species list.

In recommending the appropriation, the House Committee on Appropriations stated as follows:

"The Committee directs that the project, for which an environmental impact statement has been completed and provided the Committee, should be completed as promptly as possible for energy

---

7. Although the final environmental impact statement did not mention the snail darter by name, it did discuss rare and endangered species of fish that would be affected by the project. Eleven species of darters were listed and it was noted that new species of the darter continued to be discovered in Tennessee at about the rate of one per year. Exhibit 114–B, pp. II–12–2, 3; Exhibit 114–A, p. I–3–63.

supply and flood protection in the public interest." H.R.Rep. No. 94–319, 94th Cong., 1st Sess. 76 (1975).

During the latest congressional appropriation hearings in March of 1976, the Chairman of the House Committee asked TVA Chairman Wagner to comment on the litigation pending in connection with the snail darter. He stated, in part, as follows:

"We informed both committees last year that TVA did not construe the Endangered Species Act as preventing completion of the Tellico Project; that we believed the environmental consequences of the Tellico Project had been fully disclosed; and that TVA was doing and would do its best to preserve the darter; but, in any event, that the project should be completed on schedule . . .

"It is TVA's position that the ultimate decision to proceed with this project rests with TVA, and that TVA has acted responsibly, and in good faith in reaching its decision to complete the project. We believe that Congress did not intend the Endangered Species Act to be retroactively applied to existing projects like Tellico, which was over 50 percent complete at the time of the act's passage and the fish's discovery, and which was 70 to 80 percent complete at the time of the official listing of the snail darter as an endangered species. Even if applicable to Tellico, TVA construes section 7 of the Endangered Species Act to require Federal agencies to take reasonable measures, in consultation with the Secretary of the Interior, to conserve endangered or threatened species of fish, wildlife, and plants. The act was not intended to supplant an agency's primary responsibilities, or to repeal prior congressional approval and funding of authorized projects, such as Tellico, because the habitat of an endangered species would be altered or destroyed by completion of the project. TVA certainly does not construe the act as a mandate to halt an authorized project without regard to its stage of completion or the fact that $80 million in public funds had been appropriated by Congress and invested in a regional development project to provide flood control, navigation, hydroelectric power, water supply, and to produce other benefits, including recreation, fish and wildlife use, shoreline development, new job opportunities, industrial development, and to foster improved economic condition in an area characterized by underutilization of human resources and outmigration of young people."

The entire statement is found in *Hearings Before a Subcomm. of the House Comm. on Appropriations*, 94th Cong., 2d Sess., pt. 5, at 260–62 (1976). The identical statement was given to both the Senate and House committees.

The Tellico Project was authorized by Congress on October 15, 1966 as a multipurpose water resource and regional development project. It involves, among other things, the construction of a concrete and earthfill dam which is to create a 16,500 acre reservoir at full-pool elevation on the lower 33 miles of the Little Tennessee River. As of March 31, 1976 the main dam, spillway and auxiliary dams were 85% complete, and the entire project was about 80% complete.

The long and controversial circumstances surrounding the Tellico Project need not be recounted here as the Court has outlined the history of the project in its earlier memorandum opinions which dealt with the adequacy of the environmental impact statement filed by TVA in connection with the project. *Environmental Defense Fund v. Tennessee Valley Authority*, 339 F.Supp. 806 (E.D.Tenn.) *aff'd* 468 F.2d 1164 (6 Cir. 1972); 371 F.Supp. 1004 (E.D.Tenn.) *aff'd* 492 F.2d 466 (6 Cir. 1974). The project has continued since work was first begun in 1967, except for the delays caused by the litigation mentioned above. In excess of $78 million in public funds have been invested in the project, and if it were permanently enjoined, TVA estimates that some $53 million would be lost in nonrecoverable obligations. Some $26 million would be recoverable from the land acquired and certain highway and bridge construction and

some $20 to $23 million remain to be spent on the project.

One of plaintiffs' experts, an agricultural economist, testified that "only" $30 million of the $78 million expended to date would fall into the category of nonrecoverable obligations. This witness conceded on cross examination that he had only visited the project area one time in March 1976 and that he had spent only four or five hours in preparing his testimony. He also conceded that his analysis was limited to "ballpark figures"—with this we agree.

Although the evidence was conflicting on the recoverability of certain funds expended on new roads constructed in connection with the project, we are inclined to agree with defendant that these roads will lose most of their utility if the reservoir is not impounded.

The preponderance of the evidence indicates that the $53 million figure advanced by TVA is much more realistic than the estimate of nonrecoverable obligations advanced by plaintiffs.[8]

In respect to plaintiffs' allegation that the clear-cutting of trees and foliage along the banks of the river is posing a threat to the continued existence of the snail darter because of siltation, the preponderance of the evidence showed that these operations do not pose a present threat to the snail darter. TVA has made a reasonable effort to prevent siltation, and the silt load in the river is comparable to levels which existed prior to the present clear-cutting and bulldozing operations.

■ In the Court's Bench Memorandum, denying plaintiffs' motion for a preliminary injunction, we stated as follows:

"In the opinion of the Court, the Endangered Species Act does apply to the Tellico Project; but whether or not Congress intended the Endangered Species Act to permit halting of the Tellico Project after approximately $80 million

has been spent on it is another question, a question that will not be answered by the Court at this time."

The Endangered Species Act of 1973 became effective on December 28, 1973 more than seven years after the Tellico Project was authorized by Congress and nearly seven years after construction began. At that time more than $45 million had been appropriated for the project and over $35 million had been invested in it. *Environmental Defense Fund v. Tennessee Valley Authority*, 371 F.Supp. 1004, 1006. The snail darter was discovered several months before this Court approved TVA's final environmental impact statement. It was not listed as an endangered species until November 1975 and its critical habitat was not determined until April 1976.

■ Under these circumstances, and others heretofore outlined, is it reasonable to conclude that Congress intended the Act to halt the Tellico Project at its present stage of completion? We think not. The Act should be construed in a reasonable manner to effectuate the legislative purpose. *Sierra Club v. Froehlke*, 534 F.2d 1289, 1304 (8th Cir. 1976).

■ At some point in time a federal project becomes so near completion and so incapable of modification that a court of equity should not apply a statute enacted long after inception of the project to produce an unreasonable result. *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1331–32 (4th Cir.) *cert. den.* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). Where there has been an irreversible and irretrievable commitment of resources by Congress to a project over a span of almost a decade, the Court should proceed with a great deal of circumspection.

As stated by the District Judge in *Froehlke, supra,* where

"Congress has continuously funded the [project] for a number of years through

8. In pretrial proceedings, plaintiffs suggested that the project could be modified to make the project area into a public recreation area and the river could be left undisturbed. Thus, say plaintiffs, such a use would inure to the benefit of the public and reduce the loss if the project were abandoned. TVA pointed out, however, that the money appropriated to it was for the Tellico Project alone and that it had no authority to use the funds other than for that purpose.

various flood control acts, this Court will not substitute its judgment for that of the elected representatives of the United States." 392 F.Supp. 130, 144 (E.D.Mo. 1975), *aff'd* 534 F.2d 1289 (8th Cir. 1976).

The approach we have taken has been suggested or followed in a number of cases dealing with the applicability of the National Environmental Policy Act of 1969 to ongoing federal projects. *See, e. g., Pizitz v. Volpe*, 467 F.2d 208 (5th Cir. 1972); *Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412, 424 (2d Cir.) *cert. den.* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). In this connection, Judge Tuttle stated as follows in declining to apply NEPA to a highway project more than 80% complete when the Act was passed:

> "It is simply unreasonable to assume that Congress intended at this point in time, construction should halt, an environmental impact study should be made, and the highway possibly be rerouted." *Ragland v. Mueller*, 460 F.2d 1196, 1198 (5th Cir. 1972).

This approach has also been suggested by a commentator. Wood, *Section 7 of the Endangered Species Act of 1973: A Significant Restriction for all Federal Activities*, 5 E.L.R. 50189, 50196–97 (1975).

The Fish and Wildlife Service of the Department of the Interior has very recently promulgated guidelines to assist federal agencies in carrying out their responsibilities under § 7 of the Act. These guidelines along with a cover letter dated April 28, 1976 were introduced at trial as Exhibit 33. Part I.D. of the guidelines, entitled "Application of section 7 to Existing Activities and Programs" provides, in pertinent part, as follows:

> "In considering whether section 7 applies to actions in the . . . implementation stage but not completed prior to December 28, 1973, Federal agencies should determine if the action is . . . one being undertaken by . . . a Federal entity and substantial work remains to be done which would, independent of the effect of earlier work per-

formed, in and of itself jeopardize the continued existence of a listed species or modify or destroy critical habitat of a listed species. If . . . such work on a Federal project remains to be performed, then the requirements of section 7 should be satisfied."

In construing a statute, the interpretation given it by an agency charged with administering it ordinarily must be given considerable weight. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). In promulgating the guidelines, referred to above, however, the Service noted that they were intended as a "starting point" for the promulgation of regulations pursuant to normal rulemaking procedures which will afford interested parties the opportunity to comment on such proposed regulations. Further, the guidelines are to be used by federal agencies "at their discretion." Exhibit 33, pp. 2–3.

Thus, we do not take this guideline to be the Secretary's final statement of the manner in which § 7 is to be applied to ongoing projects. It may be that the guideline is directed toward ongoing projects which, with reasonable alterations, could be completed without violating § 7 of the Act. Perhaps the situation presented in this case is not contemplated by the guideline quoted above. At any rate, we are not inclined to give it much weight in its present tentative form.

We recognize the rule that congressional approval of appropriations does not, standing alone, repeal provisions of law in effect at the time the appropriations are approved. *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 353–54 (8th Cir. 1972); *Environmental Defense Fund v. Tennessee Valley Authority*, 468 F.2d 1164, 1182 (6th Cir. 1972). Additionally, it is recognized that the critical habitat of the snail darter was not determined until April 1976 and that Congress has not acted on the appropriation requested in January 1976 which TVA plans to use to complete the project.

Nevertheless we believe that additional funding of the Tellico Project and a House

Committee's direction to complete the project "in the public interest" after being informed by TVA that it did not construe the Endangered Species Act as preventing the project's completion is persuasive that such an interpretation of the Act is consistent with congressional intent. *Cf. Environmental Defense Fund, Inc. v. Corps of Engineers,* 492 F.2d 1123, 1140–41 (5th Cir. 1974); *United States ex rel. TVA v. Two Tracts of Land,* 456 F.2d 264, 267 (6th Cir.) *cert. den.* 409 U.S. 887, 93 S.Ct. 109, 34 L.Ed.2d 143 (1972). We are convinced that Congress was thoroughly familiar with the project when additional appropriations were made since it had been dealing with the project over a number of years.

Plaintiffs rely on several recent cases dealing with the Endangered Species Act in support of their contention that the Act should be applied with full force and effect to the Tellico Project. The case of *United States v. Cappaert,* 508 F.2d 313 (9th Cir. 1974), *cert. granted* 422 U.S. 1041, 95 S.Ct. 2654, 45 L.Ed.2d 692 (1975) deals only tangentially with the Act and appears to turn on the interpretation and effect of a 1952 Presidential Proclamation. 508 F.2d at 320.

In *National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir. 1976), the Act was applied to a highway project which began long before the Act became effective. The court enjoined further construction of a 5.7 mile segment of the highway which was to transverse the critical habitat of the Mississippi Sandhill Crane, an endangered species, pending a determination by the Secretary of the Department of Interior of what modifications are necessary to insure compliance with § 7 of the Act.

The plaintiffs in *Coleman* filed suit on May 23, 1975 and actual construction of the 5.7 mile segment in question did not begin until September 1, 1975, with a target completion date of May 29, 1978. Additionally,

the plaintiffs did not seek a permanent injunction against construction of the highway.

Thus, the *Coleman* court was faced with a case that was fundamentally different on its facts from the present case. Construction of the 5.7 mile segment was in its initial stages and relatively minor alterations to the segment were all that was necessary to effectuate full compliance with § 7. Additionally, the Mississippi Sandhill Crane had been on the endangered list since June 3, 1973 pursuant to a predecessor to the present Act.[9]

As discussed previously, impoundment of the river is integral to the entire Tellico Project and it would serve no purpose to enjoin such action pending review by the Secretary of the Department of Interior to determine what modifications would bring the project into compliance with § 7. The Secretary has made his position clear that the proposed impoundment "would result in total destruction of the snail darter's habitat." 40 Fed.Reg. at 47506.[10]

In *Sierra Club v. Froehlke, supra,* the court affirmed the District Court's denial of injunctive relief in an action to halt construction of the Meramec Park Dam and other proposed dams in the Meramec Basin. The case dealt primarily with asserted violations of NEPA and the Endangered Species Act of 1973. The Indiana Bat was the endangered species involved.

The Court of Appeals affirmed the finding of the District Court that the evidence failed to show that "present activities in constructing the Meramec Park Reservoir are adversely affecting Indiana bats in the project area." *Froehlke, supra,* 534 F.2d at 1305.

The proof showed that only a very small number of the bats would be affected out of a total population of some 700,000.

**9.** Endangered Species Conservation Act of 1969, Pub.L. 91–135. For a discussion of the background of the present Act, see 2 U.S.Code Cong. & Admin.News, 2989–2992 (1973).

**10.** The issuance of a permanent injunction in this case would have far more serious ramifica-

tions than in the ordinary case arising under NEPA. In that type of case the defendant agency can often be enjoined from further construction of a project pending compliance with the requirements of NEPA which are primarily procedural in nature.

Although the court did not deal directly with the question of the applicability of § 7 to ongoing projects, it is noted that actual construction on the project did not begin until July 1974. It is also noted that the project is not scheduled to be completed and operational until June of 1980. *Froehlke, supra,* 534 F.2d at 1293. Further, the Indiana Bat had been listed as endangered since 1966 under a predecessor to the present Act.[11]

Counsel for plaintiffs argues fervently that the Court has only limited discretion in determining whether or not an injunction should issue. It is asserted that the discretion of the Court is limited to fashioning a remedy to insure compliance with the Act, not to excuse a violation thereof. *See Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *SEC v. Advance Growth Capital Corp.,* 470 F.2d 40 (7th Cir. 1972); *Shafer v. United States,* 229 F.2d 124 (4th Cir.), *cert. den.* 351 U.S. 931, 76 S.Ct. 788, 100 L.Ed. 1460 (1956). Since Congress has expressly declared the public interest in the Endangered Species Act, the argument continues, the failure to issue an injunction will frustrate the declared congressional objectives of the Act. We cannot agree.

This case must be viewed in the context of its particular facts and circumstances. We go no further than to hold that the Act does not operate in such a manner as to halt the completion of this particular project. A far different situation would be presented if the project were capable of reasonable modifications that would insure compliance with the Act or if the project had not been underway for nearly a decade.

If plaintiffs' argument were taken to its logical extreme, the Act would require a court to halt impoundment of water behind a fully completed dam if an endangered species were discovered in the river on the

day before such impoundment was scheduled to take place. We cannot conceive that Congress intended such a result.

■ We are not suggesting that the Endangered Species Act should be administered grudgingly by the Courts, nor that the importance of any endangered species should be minimized when compared with an extensive federal project. Balancing such interests is a legislative and not a judicial function.[12]

■ Finally, we conclude that TVA has not acted arbitrarily, capriciously or otherwise not in accordance with the law in continuing further implementation of the Tellico Project. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). It has acted within the scope of authority given it by Congress and has informed Congress, through its committees, about the snail darter and its position on the application of the Endangered Species Act to the project.

TVA has made a good faith effort to conserve the snail darter and has consulted with other agencies about the problem rather than taking the immutable position that it was not required to comply with the Act.

In holding that the Army Corps of Engineers had not acted arbitrarily or capriciously in its decision to build the Gillham Dam, the Court of Appeals for the Eighth Circuit stated as follows:

"We have also taken into account, as we must, that the overall project was authorized by Congress eleven years prior to the passage of NEPA, and was sixty-three percent completed at the date this action was instituted. Almost ten million dollars has been expended and would be lost if the project were completely abandoned now." *Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289

11. Endangered Species Preservation Act of October 15, 1966 (Pub.L. 89–669).

12. Plaintiffs also argue that the injunction should issue and the question would thereby be "remanded" to Congress for it to determine if the Tellico Project should be exempted from

the Act. As pointed out previously, we think that Congress has already made it clear that the project should be completed. If we are mistaken in this conclusion, it is not too late for Congress to refuse to appropriate the funds to complete the project.

(1972) *cert. den.* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973).

For the foregoing reasons, we conclude that plaintiffs' prayer for a permanent injunction must be denied and the action dismissed.

Order accordingly.