549 F.2d 1064
 9 ERC 1737, 7 Envtl. L. Rep. 20,172
 Hiram G. HILL, Jr., Zygmunt J.B. Plater, Donald S. Cohen,
The Audubon Council of Tennessee, Inc., and The
Association of Southeastern Biologists,
Plaintiffs-Appellants,
v.
TENNESSEE VALLEY AUTHORITY, Defendants-Appellees.
 No. 76-2116.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 14, 1976.
Decided Jan. 31, 1977.
 
 Zygmunt J. B. Plater, Wayne Law School, Detroit, Mich., W. P. Boone Dougherty, Bernstein, Dougherty & Susano, Knoxville, Tenn., for plaintiffs-appellants.
 Herbert S. Sanger, Jr., Gen. Counsel, Div. of Law, T. V. A., Charles A. Wagner III, Thomas A. Pedersen, Nicholas A. DellaVolpe, Knoxville, Tenn., for defendants-appellees.
 Before CELEBREZZE, PECK and McCREE, Circuit Judges.
 CELEBREZZE, Circuit Judge.
 
 
 1
 For the third time in five years we are called upon to resolve a dispute between environmentalists and the Tennessee Valley Authority (TVA) over the legality of the Tellico Dam and Reservoir Project. The issue on appeal in this instance is the propriety of the district court's denial of Appellants' request for a permanent injunction to prevent TVA from imminently closing the Tellico Dam. Appellants allege that the resulting reservoir will flood the only recognized habitat of the snail darter, a rare protected species of river-dwelling fish, thereby jeopardizing its continued survival, in violation of §§ 7 and 9 of the Endangered Species Act of 1973.[1] 16 U.S.C. § 1531 et seq.
 
 
 2
 Tellico was initially proposed by TVA and ultimately approved by Congress in October, 1966, as a multipurpose, water resource and regional economic development project. It was primarily intended to benefit Blount, Loudon and Monroe Counties, Tennessee, "an area characterized by underutilization of human resources and outmigration of young people." Hearings before a Subcomm. of the House Comm. on Appropriations, 94th Cong., 2d Sess., at 261.
 
 
 3
 The engineering focus of the proposal was a concrete and earthfill dam to be situated near the mouth of the Little Tennessee River. This impoundment would create a navigable reservoir thirty-three miles long covering an area of 16,000 acres, including 2,100 acres of the existing river bed. Proponents of the project claimed that it would stimulate new shoreline industrial development, increase recreational opportunities and tourism, and augment existing hydro-electric power generating and flood control capabilities.[2] Congress agreed and in 1966 authorized initial Tellico project appropriations. Construction commenced in March, 1967. Closure of the dam is now scheduled to be completed in January, 1977.
 
 
 4
 For the present, the river remains free-flowing and Appellants seek to preserve it indefinitely in its present state as a natural resource.[3] TVA counters that it is the express will of the Congress that Tellico "be completed as promptly as possible in the public interest." S.Rep.No.94-960, 94th Cong., 2d Sess. 96 (1976). TVA believes that such an unequivocal expression of congressional intent neutralizes any violation of the Endangered Species Act which may be involved in the impoundment of the river. We are therefore asked to balance the survival of a living species against the completion of a public works project which is more than 80% completed and represents a federal investment of almost ninety million dollars.
 
 
 5
 In 1971 and again in 1973, environmentalists and affected landowners petitioned the federal court seeking to forestall construction of the Tellico Dam on the ground that TVA had failed to comply with requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. They were successful in obtaining a preliminary injunction which halted project implementation for more than a year and a half,[4] affirmed by this Court in Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164 (6th Cir. 1972), but the district court ultimately concluded that TVA's revised Tellico environmental impact statement fully complied with NEPA,[5] and we affirmed. Environmental Defense Fund v. Tennessee Valley Authority, 492 F.2d 466 (6th Cir. 1974).
 
 
 6
 In August, 1973, a University of Tennessee ichthyologist discovered a unique and theretofore unknown species of fish, the snail darter (Percina Imostoma tanasi), thriving in the Little Tennessee River. This three-inch, tannish, bottom-dwelling member of the perch family was found to feed upon fresh water snails (from whence its name was derived). In addition to providing the snail darter with a bountiful supply of its primary food, the river also maintained the oxygen levels required to sustain the species through aerating action of its rapidly flowing currents. The range of the snail darter's habitat encompassed seventeen miles of the river's course scheduled to be subsumed within the Tellico Reservoir. A search of other rivers of comparable ecology confirmed that the Little Tennessee was virtually the exclusive preserve of the world's snail darter population (recently estimated to number between 10,000 and 15,000 fish).[6]
 
 
 7
 On December 28, 1973, four months after the discovery of the snail darter, Congress passed the Endangered Species Act, 16 U.S.C. § 1531 et seq. One of the Act's purposes was "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . ." 16 U.S.C. § 1531(b). Section 1533 of the Act empowered the Secretary of the Interior to compile and maintain separate official lists of threatened and endangered species.[7] Section 1536 unequivocally commits all federal agencies to:
 
 
 8
 utilize their authorities in furtherance of the purposes of (the Act) by . . . taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered species and threatened species or result in the destruction or modification of habitat of such species which is determined by the Secretary . . . to be critical. (emphasis added).
 
 
 9
 Section 1540(g)(1)(A) authorizes suits by private citizens seeking "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of (the Act) or regulation issued under the authority thereof."
 
 
 10
 In January, 1975, several persons, including Appellants Hill and Plater, petitioned the Secretary of the Interior to add the snail darter to the endangered species list. Section 1533(c)(2). As part of the rule making procedure,[8] TVA was invited by the Department to comment. On November 10, 1975, over TVA's objections, the snail darter was designated as an endangered species primarily because of the threat posed by the Tellico project to destroy the species and its only known habitat.[9] 50 C.F.R. § 17.11(i) (1975); 40 Fed.Reg. 47505-47506 (1975). As required by § 1540(g)(2)(A)(i), Appellants notified both the Department of the Interior and TVA on October 20, 1975, that continued preparations to impound the Little Tennessee River would violate § 1536.
 
 
 11
 On February 28, 1976, Appellants brought suit in United States District Court for the Eastern District of Tennessee seeking to permanently enjoin completion of the dam. In April, the United States Fish and Wildlife Service, acting pursuant to rule making authority originally granted to the Secretary of the Interior in § 1536, designated river miles .5 to 17 as the "critical habitat" of the snail darter. 41 Fed.Reg. 13926-13928 (1976); see 50 C.F.R. § 17.81 (1976).[10] On April 29th and 30th a trial was held during which evidence was presented pertaining to whether the scheduled inundation of the Little Tennessee would jeopardize the species' continued survival. The Court also entertained argument on whether permanent injunctive relief would be appropriate to enforce compliance with the Act if the evidence made out a prima facie violation of §§ 1536 or 1538(a)(1)(B). In a memorandum opinion and order dated May 25, 1976,[11] the court concluded:
 
 
 12
 . . . the preponderance of the evidence demonstrates that closure of the Tellico Dam in January 1977 and the consequent creation of the Tellico Reservoir will result in the adverse modification, if not complete destruction, of the snail darter's critical habitat.[12]
 
 
 13
 However, the Court denied Appellants' prayer for a permanent injunction and dismissed the action based upon an analysis of the equities which it found to be controlling.
 
 
 14
 Appellants claim that the Court's refusal to impose an injunction was legally inconsistent with its finding of a blatant statutory violation. They contend that the Court clearly abused its discretion in light of express congressional recognition, in § 1540(g)(1)(A), of the appropriateness of injunctive relief to redress violations of the Act or of rules promulgated thereunder. They find no support within the language of the Act or its legislative history for exempting on-going projects from compliance and therefore ask us to enforce the letter of the law by summarily halting Tellico Dam construction. Appellants argue that only Congress and the Secretary of the Interior have the power to relieve TVA of its obligations under the Act through enabling legislation or remedial rule making respectively. Our abiding interest in preserving the functional independence of the coordinate branches of government, as ordained by the constitutional separation of their enumerated powers, compels us to reverse the District Court and grant the relief requested. Wilderness Society v. Morton, 156 U.S.App.D.C. 121, 479 F.2d 842, 892-893 (1973).
 
 
 15
 Although this legal controversy may well enjoy a modicum of notoriety because it appears to pit the survival of an obscure fish against completion of a $100 million reservoir, "the principles of law controlling (the case) are neither complex nor revolutionary." Wilderness Society, supra, at 891. Only three questions need be addressed:
 
 
 16
 1) Does Tellico Dam completion violate the Endangered Species Act?
 
 
 17
 2) Assuming a violation, are there adequate grounds for exempting Tellico from compliance?
 
 
 18
 3) If no exemption is justified, is injunction the proper remedy to effectuate the purposes of the Act?
 
 
 19
 We are satisfied that TVA's continued preparations to dam the Little Tennessee violate § 1536 of the Endangered Species Act. The District Court concluded from the evidence at trial that "it is highly probable that closure of the Tellico Dam and the consequent impoundment of the river behind it will jeopardize the continued existence of the snail darter." TVA conceded that a significant portion of the designated "critical habitat" of the snail darter would be altered by conversion of the free-flowing river to a reservoir. The record supports Appellants' claim that the intrinsic environmental differences between river and reservoir bottom will inexorably destroy large numbers of snail darter eggs as well as inhibit the species' spawning instinct. Therefore, the District Court properly determined that, because so few specimens have been found outside the critical habitat area, "the known population of snail darters will be significantly reduced if not completely extirpated . . ." by the drastic physical transformations to be accomplished by closure of the dam.
 
 
 20
 For reasons not obvious from the record, the District Court's opinion does not explicitly conclude that its factual findings constitute a prima facie violation of § 1536.[13] We rectify this defect now by construing footnote 1 of the memorandum opinion as conclusive evidence that this was the intent of the Court.[14] In determining whether TVA's creation of the reservoir contravenes this section, the District Court appears to have relied upon an administrative definition of violative conduct by the Secretary of the Interior. Under this standard, an action affecting a designated critical habitat is deemed to be an offense if it,
 
 
 21
 . . . might be expected to result in a reduction in the number or distribution of (the) species of sufficient magnitude to place the species in further jeopardy, or restrict the potential and reasonable expansion or recovery of that species.
 
 
 22
 40 Fed.Reg. 17764-17765 (1975).
 
 
 23
 Although we are not compelled to follow agency constructions of a regulatory measure, courts have traditionally shown "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 308 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). Section 1536 conveys a pivotal role to the Secretary of the Interior to achieve voluntary compliance with the policy objectives of the Act by federal agencies and departments whose programs may alter critical ecosystems. The Secretary is not empowered to veto the final actions of such agencies, even when he is convinced, after the requisite consultation has ensued, that they violate the Act, National Wildlife Federation v. Coleman,529 F.2d 359, 371 (5th Cir. 1976); accord, Sierra Club v. Froehlke, 534 F.2d 1289, 1303 (8th Cir. 1976). However, his compliance standards may properly influence final judicial review of such actions, particularly as to technical matters committed by statute to his special expertise.
 
 
 24
 We find the Secretary's interpretation of § 1536 to be both reasonable and consistent with our reading of the Act's legislative history.[15] In the absence of conflicting judicial precedents, we see positive benefit to be gained by impressing his criteria with a judicial imprimatur. This will expedite the adjudication of future cases as well as assist the Secretary in achieving a uniform federal conservation posture with minimal reliance upon the courts. Applying this test to the District Court's findings of fact, we conclude that TVA's Tellico project operations violate § 1536.[16]
 
 
 25
 TVA concedes the existence of a predictable causal nexus between the impoundment of the Little Tennessee and the ultimate depletion of the snail darter population. This admission alone suffices to bring the affirmative action requirement of § 1536 into play. On appeal, however, TVA argues that closure of the Tellico Dam, as the last stage of a ten year project, falls outside the legitimate purview of the Act if it is rationally construed. TVA cautions that it would lead to absurd results if we were to include the terminal phases of on-going projects among the "actions" of departments and agencies to be scrutinized for compliance. We find this familiar line of reasoning unpersuasive and believe that the District Court erred in adopting it. See Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d at 1177.
 
 
 26
 To countenance so restrictive a construction of § 1536, in the absence of positive reinforcement from the Act's legislative history, would, in our view, be inimical to achieving its objectives. We choose instead to give the term "actions" its plain meaning in the belief that this will best effectuate the will of the Congress.
 
 
 27
 The complexity of the ecological sciences suggests that the detrimental impact of a project upon an endangered species may not always be clearly perceived before construction is well underway. In effect, such was the case here. For Congress or the Secretary of the Interior to be able to make meaningful decisions in furtherance of the purposes of the Act, the opportunity to choose must be preserved. Once a living species has been eradicated, discretion losses its significance. Where a project is on-going and substantial resources have already been expended, the conflict between national incentives to conserve living things and the pragmatic momentum to complete the project on schedule is most incisive. Therefore, were we to deem the extent of project completion relevant in determining the coverage of the Act, we would effectively defeat responsible review in those cases in which the alternatives are most sharply drawn and the required analysis most complex. This expedient strategy would frustrate effective enforcement of the Act and hinder efforts to prevent the wanton destruction of vulnerable species.
 
 
 28
 Current project status cannot be translated into a workable standard of judicial review. Whether a dam is 50% or 90% completed is irrelevant in calculating the social and scientific costs attributable to the disappearance of a unique form of life. Courts are ill-equipped to calculate how many dollars must be invested before the value of a dam exceeds that of the endangered species. Our responsibility under § 1540(g)(1)(A) is merely to preserve the status quo where endangered species are threatened, thereby guaranteeing the legislative or executive branches sufficient opportunity to grapple with the alternatives.
 
 
 29
 The importance of this role is admirably demonstrated by a hypothetical situation postulated by the district court:
 
 
 30
 If Plaintiff's argument were taken to its logical extreme, the Act would require a court to halt impoundment of water behind a fully completed dam if an endangered species were discovered in the river on the day before such impoundment was scheduled to take place.[17]
 
 
 31
 The district court dismissed this proposition out of hand as unreasonable and inconsistent with the intent of Congress. We disagree. Conscientious enforcement of the Act requires that it be taken to its logical extreme.
 
 
 32
 In National Wildlife Federation v. Coleman, 529 F.2d 359 (5th Cir.) cert. denied, --- U.S. ----, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976), for example, the welfare of the Mississippi Sandhill Crane was threatened by future construction of a 5.7 mile segment of Interstate Highway I-10 scheduled to traverse the Crane's designated critical habitat. Only 40 Sandhill Cranes are known to exist. Based upon the weight of the evidence, the Fifth Circuit reversed the district court's denial of injunctive relief and remanded the case with instructions that an injunction issue halting activities which might "jeopardize the continued existence of the Mississippi Sandhill Crane or destroy or modify critical habitat" in violation of § 1536. Id. at 375. The injunction is to remain in effect until the Secretary of the Interior determines that modifications to the project will bring it into compliance with the Act.
 
 
 33
 In assessing the potential adverse impact of the highway upon the Crane's habitat, the Fifth Circuit concluded that indirect effects such as accompanying private development were relevant factors. This broad reading of the protection afforded by § 1536 is consonant with our view. If injunctive relief is appropriate where extirpation of the species is not a predictable consequence of the violative activity, as in the Sandhill Crane case, it is unquestionably mandated here where eradication is a realistic possibility.
 
 
 34
 We reject as inapposite all but one of the NEPA cases cited by TVA in support of its on-going project exemption theory. In Environmental Defense Fund v. Tennessee Valley Authority, Judge McCree, speaking for this Court, held that, even if it were conceded that Tellico was a unified construction effort, a single "ball of wax" whose contours were known and approved by Congress prior to NEPA's effective date, Tellico was not excused from full compliance with environmental impact statement requirements for on-going activities. 468 F.2d at 1172. We find Judge McCree's expression of the congressional intent behind NEPA to be an accurate reflection of the pervading spirit of the Endangered Species Act:
 
 
 35
 . . . Congress envisaged on-going agency attempts to minimize environmental harm caused by the implementation of agency programs. This could encompass not only constant reevaluations of projects already begun to determine whether alterations can be made in existing features or whether there are alternatives to proceeding with projects as initially planned, but also the consideration of the environmental impact of all proposed agency action. Id. at 1176 (emphasis added).
 
 
 36
 All of the other NEPA cases which waive compliance based upon advanced project construction, see e. g., Ragland v. Mueller, 460 F.2d 1196, 1198 (5th Cir. 1972); Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, 470 F.2d 289, 301 (8th Cir. 1972), are readily distinguished by one fact which they all share: any judicial error in a NEPA case is subject to later review and remedial reversal before permanent damage is done to the environment. The same cannot be said for an erroneously granted exemption from the Endangered Species Act. If we were to err on the side of permissiveness here, and allow TVA to complete and close the dam as scheduled, the most eloquent argument would be of little consequence to an extinct species.
 
 
 37
 We conclude that the on-going nature of a project does not preclude enforcement of § 1536. National Wildlife Federation v. Coleman, supra; Sierra Club v. Froehlke, 534 F.2d 1289, 1305 (8th Cir. 1976).[18] TVA has failed to take the necessary steps to insure that the impoundment of the Little Tennessee River will not jeopardize the survival of the snail darter or modify its habitat. We, therefore, find that continued work, directed toward impoundment, violates § 1536 of the Act. See National Wildlife Federation v. Coleman, supra at 373.
 
 
 38
 We cannot condone non-compliance on the theory propounded by TVA that congressional approval of Tellico appropriations, upon full disclosure of the plight of the snail darter, constitutes legislative acquiescence in or express ratification of TVA's laissez faire interpretation of the Act. See Hearings on Public Works for Water and Power Development Appropriation Bill, 1977, before a Subcomm. of the House Comm. on Appropriations, 94th Cong., 2d Sess. at 260-262 (1976). Advisory opinions by Congress concerning the "proper" application of an existing statute cannot influence our review because they lack the force of law. To credit them would be tantamount to permitting the legislature to invade a province reserved to the courts by Article III of the constitution. The meaning and spirit of the Act are clear on its face. We need not refer to legislative history to rationalize our independent assessment of its impact. See e. g., United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); United States v. Jones, 542 F.2d 661 (6th Cir. 1976). As the District of Columbia Circuit has said in a similar context:
 
 
 39
 (I)t is well settled that repeal by implication is disfavored, and the doctrine applies with full vigor when, as here, the subsequent legislation is an appropriations measure, and when the prior Act is to continue in its general applicability, as construed by the courts, but the claim is made that it is to be subject to a particularized legislative exception. Committee For Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App. D.C. 380, 463 F.2d 783, 785 (1971) (footnotes omitted).
 
 
 40
 If the separation of powers doctrine is to retain its vitality, Congress must be free to appropriate funds for public works projects with the expectation that resulting executive action will pass judicial muster. See Environmental Defense Fund, Inc., v. Froehlke, 473 F.2d 346, 355 (8th Cir. 1972). Conversely, courts must defend their prerogative to apply the law as they find it "to require the Executive to abide by the limitations prescribed by the Legislature." Wilderness Society v. Morton, supra at 892. Judge Skelly Wright, in commenting upon the imperative nature of this division of labor, has observed that:
 
 
 41
 The scrupulous vindication of that principle of law, implicit in our form of government . . . and its (basic) checks and balances, looms more important in the abiding public interest than the embarkation on any immediate or specific project, however desirable in and of itself, in contravention of that principle. Id.
 
 
 42
 Congress recognized the danger of bypassing plenary consideration of proposed modification to existing laws by adding amendments to appropriations bills. As the Eighth Circuit notes in Environmental Defense Fund v. Froehlke, House Rule XXI is specific in providing that "no appropriation shall be reported in any general appropriation bill, . . . Nor shall any provision in any such bill or amendment thereto changing existing law be in order, . . . " 473 F.2d 346, 354 (emphasis added).
 
 
 43
 TVA directs us to our own decision in United States ex rel. TVA v. Two Tracts of Land, 456 F.2d 264 (6th Cir. 1972), as evidence of our reliance upon congressional spending decisions as indicia of legislative approval of the application of existing laws by the executive branch. This citation bespeaks a misapprehension of the significance of that case. It also ignores the relevance of our rejection in a more recent decision of TVA's argument that sustained congressional appropriations excused Tellico from full compliance with NEPA. Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d at 1182. In Two Tracts we viewed the continued financing of TVA's on-going land acquisition activities as implied ratification by Congress of a system of rules and regulations promulgated by TVA to give effect to enabling legislation which the Authority was charged with administering.[19] We found nothing in TVA's procedure which conflicted with reasonable attainment of that legislation's fundamental goals. Where a statute or executive order provides but the bare bones of a project authorization, leaving the administrative "flesh" to be added by an implementing authority, courts may properly interpret sustained congressional appropriations as some evidence that the evolving form of the project effectuates the original legislative intent.
 
 
 44
 In the instant case, however, TVA is neither charged with administering the Act nor is its conduct compatible with the measure's conservationist aims. In spite of this, TVA asks us to bow to the will of Congress as it may be construed from pronouncements of two congressional appropriations subcommittees.[20] As a court we cannot countenance such patent usurpation of legislative authority. Nor will we expurgate an important federal policy statute designed to foreclose all activities antithetic to the preservation of the "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people" of vulnerable species of fish, wildlife and plants. 16 U.S.C. § 1531(a)(3); see United States v. Jones, supra at 673. We are fully in accord with the 4th Circuit's view, in West Virginia Division of Izaak Walton League of America, Inc. v. Butz, that:
 
 
 45
 Economic exigencies . . . do not grant courts a license to rewrite a statute no matter how desirable the purpose or result might be . . . (T)he appropriate forum to resolve this complex and controversial issue is not the courts but the Congress. 522 F.2d 945, 955 (4th Cir. 1975).
 
 
 46
 With no cause to exempt the Tellico project from strict compliance with the Act, we find that the District Court abused its discretion in refusing to permanently enjoin all further actions by TVA which may detrimentally alter the critical habitat of the snail darter. We cannot accept TVA's contention that, even if Tellico completion is technically in violation of the law, halting further construction pending intervention by Congress or additional rule making by the Secretary of the Interior constitutes an inequitable remedy.
 
 
 47
 TVA claims to have done everything possible to save the snail darter, short of abandoning work on the dam. That alternative is deemed by TVA to be innately unreasonable. We do not agree. It is conceivable that the welfare of an endangered species may weigh more heavily upon the public conscience, as expressed by the final will of Congress, than the writeoff of those millions of dollars already expended for Tellico in excess of its present salvagable value.
 
 
 48
 We recognize that TVA has completed an experimental transplant of some 700 snail darter specimens from the Little Tennessee to the Hiwassee River which is of similar physical character. While we share the hope that conclusive evidence, not yet available, will confirm that the displaced population is thriving and reproducing, even if that evidence were properly before us, it would not alter our decision to enjoin further Tellico Dam construction. It is not the courts but the Secretary of the Interior who bears the responsibility for maintaining the endangered species list and designating the critical habitats of listed species. The fact that both of these determinations are accomplished by rule-making rather than by adjudication confirms the public importance of the issues at stake. Nowhere in the Act are courts authorized to override the Secretary by arbitrarily "reading" species out of the endangered list or by redefining the boundaries of existing critical habitats on a case-by-case basis. The standard of judicial review of such rule-making, defined in Section 706 of the Administrative Procedures Act, as interpreted in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), is restrictive.[21] It does not permit substitution of judgment. TVA will have to petition the Secretary if it wishes to attempt to blunt the impact of the Act by curative rule-making. So long as the snail darter remains on the endangered list and its critical habitat comprises miles .5 through 17 of the Little Tennessee River, we have no recourse but to enjoin creation of the reservoir.
 
 
 49
 Although we must reverse the district court's decision, we are sympathetic to its analysis of the equitable factors present here which would normally militate against granting injunctive relief. TVA has not acted in bad faith. Its efforts to preserve the snail darter appear to be reasonable.
 
 
 50
 As we have already demonstrated, only Congress or the Secretary of the Interior can properly exempt Tellico from compliance with the Act. The separation of powers doctrine is too fundamental a thread in our constitutional fabric for us to be tempted to preempt congressional action in the name of equity or expediency.
 
 
 51
 The district court abused its discretion when it refused to enjoin a clear violation of federal law. As the Supreme Court has said in Hecht v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); where the national policy objectives of a statute have been frustrated, " . . . the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief . . . " Accord, Securities & Exchange Commission v. Advance Growth Capital Corp., 470 F.2d 40, 53 (7th Cir. 1972).
 
 
 52
 Therefore, we reverse the district court's order of dismissal and remand the cause with instructions that a permanent injunction issue halting all activities incident to the Tellico Project which may destroy or modify the critical habitat of the snail darter. This injunction shall remain in effect until Congress, by appropriate legislation, exempts Tellico from compliance with the Act or the snail darter has been deleted from the list of endangered species or its critical habitat materially redefined.
 
 
 53
 Reversed and remanded.
 
 
 54
 McCREE, Circuit Judge (concurring).
 
 
 55
 I concur in the judgment of the court. The district court found that the completion of the Tellico dam would "jeopardize the continued existence of the snail darter," and, therefore, we must conclude that completion of the project would violate the Endangered Species Act. The Tellico dam project is not exempt from the provisions of the Act, either because it was begun before the Act was passed and before the snail darter was listed as an endangered species, or because a Congressional committee was aware of the fact that the snail darter would be threatened by completion of the dam when the Congress approved additional appropriations. I agree that the case should be remanded with instructions to issue an injunction forbidding project activity that would threaten the existence of the snail darter.
 
 
 
 [1]
 16 U.S.C. §§ 1536 and 1538(a)(1)(B) respectively
 
 
 [2]
 The Tellico Dam will have no electrical generators, but will contribute hydrostatic capacity to the existing TVA system via an 850 foot canal connecting the Tellico Reservoir with the Fort Loudon Reservoir
 
 
 [3]
 Environmental Defense Fund v. Tennessee Valley Authority, 339 F.Supp. 806, 809 (E.D.Tenn.1972), summarizes in considerable detail the scenic, historical, archeological and recreational attributes of the Little Tennessee River in its pristine state
 
 
 [4]
 Id
 
 
 [5]
 Environmental Defense Fund v. Tennessee Valley Authority, 371 F.Supp. 1004 (E.D.Tenn.1973)
 
 
 [6]
 TVA searched unsuccessfully for the species in 60 to 70 rivers in Alabama and Tennessee. Less than 70 specimens have been sighted downstream from the location of the Tellico Dam itself and none have been found above river mile 18 of the Little Tennessee
 
 
 [7]
 The snail darter is not one of the species over which the Secretary of Commerce has "program responsibilities" pursuant to Reorganization Plan Number 4 of 1970. 16 U.S.C. § 1533(a)(2)
 
 
 [8]
 16 U.S.C. § 1533(b) and the rule making provisions of the Administrative Procedure Act, 5 U.S.C. § 553, collectively define the procedures which the Secretary of the Interior must follow in maintaining the lists of threatened and endangered species. See 16 U.S.C. § 1533(f)(1)
 
 
 [9]
 See 16 U.S.C. § 1533(a)(1) (factors (1) and (5))
 
 
 [10]
 "Critical habitat" is administratively defined by the Department of the Interior at 40 Fed.Reg. 17764-17765 (1975)
 
 
 [11]
 Hill et al. v. Tennessee Valley Authority, 419 F.Supp. 753 (E.D.Tenn.1976) (hereinafter cited as Memorandum Opinion )
 
 
 [12]
 Id. at 757
 
 
 [13]
 Because the district court concluded that closure of the Tellico Dam would violate Section 7, it did not consider whether the same state of facts also constituted a violation of Section 9 of the Act. 16 U.S.C. § 1538(a)(1) (B). See note 14 infra. We need not reach this issue because it does not alter the outcome of this appeal
 
 
 [14]
 "In light of this conclusion (that 'closure of the Tellico Dam and consequent creation of the Tellico reservoir will jeopardize the continued existence of the snail darter or destroy or modify the critical habitat thereof'), we do not deem it necessary to decide whether defendant's activities constitute an illegal 'taking' of the species in violation of § 9 of the Act." (citation omitted) Memorandum Opinion at 755 n. 1
 
 
 [15]
 See 2 U.S.Code Cong. & Admin.News 1973, 93rd Cong., 1st Sess., at 2989-3008
 
 
 [16]
 The Department of the Interior reached the same conclusion. See letter by Assistant Secretary Reed. Memorandum Opinion at 757
 
 
 [17]
 Memorandum Opinion at 763
 
 
 [18]
 In Sierra Club v. Froehlke (the "Indiana Bat" case) the 8th Circuit implicitly conceded the applicability of the Act to an on-going dam construction project, but affirmed the district court's finding that the evidence was insufficient to make out a substantive violation of Sections 7 or 9
 
 
 [19]
 The land was acquired for the Land Between the Lakes Project authorized by the President under authority conveyed by 16 U.S.C. § 831u (1964). The authority to condemn properties was vested in TVA by other subsections of that enabling legislation. 456 F.2d at 267
 
 
 [20]
 See e. g., S.Rep. 94-960, 94th Cong., 2d Sess. 96 (1976)
 
 
 [21]
 For an apt analysis of the appropriate scope of review of discretionary agency action, see Sierra Club v. Froehlke, 534 F.2d at 1304-1305. Here we have applied the Overton Park standard to find that, although TVA has acted within the scope of its authority, its decision to complete the Tellico Dam at the expense of the snail darter is "not in accordance with law." Id