**NATIONAL AUDUBON SOCIETY, Plaintiff,**

v.

**Cecil D. ANDRUS et al., Defendants,**

**The State of North Dakota and the Garrison Diversion Conservancy District, Intervenor-Defendants.**

**Civ. A. No. 76–0943.**

United States District Court, District of Columbia.

Dec. 9, 1977.

Bruce J. Terris, Washington, D.C., Charles K. Dayton, Minneapolis, Minn., for plaintiff.

Andrew F. Walch, Washington, D.C., for defendants.

Frederick L. Miller, Jr., Sp. Asst. Atty. Gen., Washington, D.C., Allen I. Olson, Atty. Gen. of N.D., Bismarck, N.D., for intervenor-defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

The case is before the Court on the motion of the intervenor-defendants, the State of North Dakota and the Garrison Diversion Conservancy District, to dismiss or for judgment on the pleadings. They allege that this case has been rendered moot by the May 11, 1977, stipulation and the enactment of the Public Works for Water and Power Development and Research Act, 1978, Pub.L. No. 95–96, 91 Stat. 797, which appropriated funds for the Garrison Diversion Unit (GDU). For the reasons hereinafter stated, the Court finds that neither the stipulation nor the appropriations act renders this case moot.

## I. BACKGROUND

Plaintiff brought this suit challenging the actions of then-Secretary of the Interior Kleppe in constructing the GDU of the Pick-Sloan Missouri River Basin Project in North Dakota. Plaintiff alleges, *inter alia*, a violation of the National Environmental Policy Act (NEPA). In its complaint, plaintiff described those portions, characteristics, and environmental impacts of the project to which it objected and set forth with specificity the purportedly extensive failings of the final environmental impact statement (EIS). Plaintiff seeks to enjoin the defendants from constructing the project, condemning land for the project or contracting for construction of the project. Both the State of North Dakota and the Garrison Diversion Conservancy District intervened as of right, pursuant to Fed.R.Civ.P. 24(a).

The litigation proceeded and cross-motions for summary judgment were filed. Before the Court ruled on these motions, a Stipulation was entered into, on May 11, 1977, which stayed the proceedings pending the filing of a comprehensive supplementary environmental statement. The intervenors did not sign the Stipulation but admitted at a hearing that they had no objection to a stay. The Court approved the Stipulation and expressly retained jurisdiction over the case. On August 8, 1977, the President signed P.L. 95–96, which appropriated $18,660,000.00 for construction of the GDU.

## II. THE MAY 11 STIPULATION DOES NOT RENDER THIS LITIGATION MOOT

■ The intervenors argue that the case is moot because there is presently no "case or controversy" before the Court. They claim that the May 11 Stipulation removes the adverseness and justiciability required under Article III of the United States Constitution.

The Court finds that the Stipulation has not mooted the issues in this case, but has only stayed the proceedings. This is clear from the language of the Stipulation, from the intervenors' own admission, and from the hearing held on May 11, 1977.

The Stipulation states:

In light of the difficulties associated with the litigation noted above and the uncertainties raised by the President's recommendation that the Garrison Diversion Unit be substantially modified, as well as the issues pending in regard to the Boundary Waters Treaty of 1909 between Canada and the United States, the parties deem *a stay of this judicial proceeding to be warranted.*

The parties recognize that the issues raised by the plaintiff may become altered as a result of the actions of the federal defendants under this agreement and subsequent congressional action.

Accordingly, to conserve judicial resources and afford the Secretary of Interior and the Commissioner of the Bureau of Reclamation an opportunity to undertake the commitments made herein, the parties agree to *a stay of all proceedings in this action.*

Stipulation, at 1–2 (emphasis added). Thus, the Stipulation did not resolve or settle any of the issues raised by the plaintiff; it only stayed the litigation until a new EIS is prepared. In fact, the Stipulation itself recognized that nothing in the Stipulation should be construed as "conceding any of the legal issues or defenses . . . raised by the pleadings" and that the agreement was to be enforced "as part of the *pending* litigation." Stipulation, at 5 (emphasis added). The intervenors themselves have admitted, in a previous brief, that the Stipulation "is, quite simply, a stay of the proceedings. No judicial relief was sought or imposed other than the stay.[1]" Consequently, the Stipulation does not moot any of the issues in this case.

Further evidence of the nature of the Stipulation and how the Court and parties viewed it can be found in the transcript of the hearing held on the day the Stipulation was signed. The Court was advised by counsel for the plaintiff that it was a vital part of the agreement that this Court continue its jurisdiction over the case. Transcript, at 5 (May 11, 1977). After considering this request, the Court noted:

[P]laintiff requested that the Court keep the case on its calendar until such time as the process spelled out in the proposed stipulation and order has been completed, the proposed stipulation indicating that there may very well be vast changes in the project from that which is presently contemplated and the issues that arise from the pleadings as they are presently drawn. In view of the great national significance of this particular case and the importance of the case to the public, not only in the immediate area where the

---

1. Memorandum of the State and District in Opposition to Plaintiff's Motion for an Injunction, at 7 (August 15, 1977).

Garrison project is proposed, but also to the whole country, the Court will do so. Transcript, at 25. Accordingly, the Court retained jurisdiction over this litigation, recognizing that the issues involved had not been resolved. Therefore, the Stipulation does not render this case moot.

### III. P.L. 95–96 DOES NOT RENDER THIS LITIGATION MOOT

The intervenors next argue that P.L. 95–96 amounts to a Congressional determination of the adequacy of the present EIS. They claim that, through this appropriations act, Congress, with knowledge of this pending litigation, authorized the Executive Branch to proceed with the GDU. The intervenors contend that, in so doing, Congress has ruled upon the adequacy of the EIS and that the Court lacks jurisdiction to review Congress' actions in authorizing the construction of the GDU.

To accept the intervenors' argument would be to allow Congress to legislate through an appropriations act. It is well established in this Circuit that Congress cannot and does not legislate through the appropriations process. *See Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971); *National Wildlife Federation v. Andrus*, 10 ERC 1353, 1356, 440 F.Supp. 1245 (D.D.C.1977); *Atchison, Topeka and Santa Fe Railway Co. v. Callaway*, 382 F.Supp. 610, 620 (D.D.C.1974). This proposition is also supported by the rules of both Houses of Congress. Rule XXI of the Manual of the House of Representatives states:

2. No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless on continuation of appropriations for such public works or projects as are already in progress. *Nor shall any provision in any such bill or amendment thereto changing existing law be in order*

. . . ..

Manual and Rules of the House of Representatives, 95th Congress, H.R.No.663, 94th Cong., 2d Sess. 562–63 (1977) (emphasis add-

ed.) Similarly, Rule XVI(4) of the Standing Rules of the Senate provides:

No amendment which proposes general legislation shall be received to any general appropriation bill, nor shall any amendment not germane or relevant to the subject matter contained in the bill be received, nor shall any amendment to any item or clause of such bill be received which does not directly relate thereto; nor shall any restriction on the expenditure of the funds appropriated which proposes a limitation not authorized by law be received if such restriction is to take effect or cease to be effective upon the happening of a contingency; . . .

Standing Rules of the United States Senate, 95th Congress, 1st Sess. 18 (1977). Thus, P.L. 95–96, an appropriations act, cannot be construed as legislation "changing" existing law.

The intervenors attempt to evade this principle by contending, not that P.L. 95–96 either repealed or "changed" NEPA, but, rather, that Congress, through P.L. 95–96, expressed its determination that the EIS complies with the NEPA requirements. The Court rejects the intervenors' attempt to rephrase the issue to avoid the principle that appropriations acts cannot change existing law.

A similar argument has already been rejected by this Circuit and by other courts. In *Realty Income Trust v. Eckerd*, 564 F.2d 447 at 458 n. 38 (D.C.Cir. 1977), the Court of Appeals recently stated that "Congressional approval of appropriations measures has not been read as a conclusive determination of the sufficiency of related impact statements." In *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971), the court remarked:

we conclude that the district court accepted the validity of the contention that was most strongly pressed by the Government: that Congress's passage of authorization and appropriations bills for the [nuclear warhead] test *represented a conclusive determination of the sufficiency of the impact statement. This contention*

*was, in our view, erroneous,* and in order to avoid the continuance of an order that was predicated on an impermissible basis, the judgment of the District Court must be reversed.

463 F.2d at 785 (emphasis added). Furthermore, in *State of Ohio ex rel. Brown v. Callaway,* 364 F.Supp. 296 (S.D.Ohio 1973), *aff'd in part and reversed in part,* 497 F.2d 1235 (6th Cir. 1974), the court observed:

These appropriations do not relieve any Federal agencies from their obligations under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970), under a theory of implied Congressional exemption *or a final Congressional approval of any Environmental Impact Statement then in existence.* See *Environmental Defense Fund v. Tennessee Valley Authority,* 468 F.2d 1164 (6th Cir. 1972); *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 353–355 (8th Cir. 1972); · *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971); Rule XXI of the House of Representatives; S.Rep.No.91–118, 91st Cong., 2d Sess. (1970).

364 F.Supp. at 297 n. 1 (emphasis added). As these cases demonstrate, courts have consistently rejected the argument advanced by the intervenors; therefore, Congress cannot approve an EIS through the appropriations process.

Moreover, the intervenors' argument contravenes the basic allocation of function between Congress and the courts in implementing NEPA. In *Environmental Defense Fund, Inc. v. Corp. of Engineers,* 492 F.2d 1123, 1140–41 (5th Cir. 1974), the court held that even if Congress makes the ultimate decision to proceed with the project, it is the court's role to determine the adequacy of the EIS. As the court in *Hill v. Tennessee Valley Authority,* 549 F.2d 1064 (6th Cir. 1977), noted:

Advisory opinions by Congress concerning the "proper" application of an *existing* statute cannot influence our review because they lack the force of law. To credit them would be tantamount to permitting the legislature to invade a province reserved to the courts by Article III of the Constitution. . . . If the separation of powers doctrine is to retain its vitality, Congress must be free to appropriate funds for public works projects with the expectation that resulting executive action will pass judicial muster.

549 F.2d at 1072–73. See *Environmental Defense Fund, Inc. v. Hoffman,* 421 F.Supp. 1083, 1089 (E.D.Ark.1976); *Sierra Club v. Morton,* 431 F.Supp. 11, 24–25 (S.D.Tex. 1975). Thus, it is the duty of the courts and not of Congress to decide whether an EIS is adequate within the meaning of NEPA.

Even if Congress has the power to rule upon the adequacy of an EIS, the exercise of such power would be a limitation upon judicial review and cannot be permitted unless there is a showing of "clear and convincing" evidence that Congress intended to restrict review. See *Barlow v. Collins,* 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970);. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The appropriations act here does not contain clear and convincing evidence that Congress intended to deny judicial review. See *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346, 353 (8th Cir. 1972) (rejects argument that appropriations for project after an impact statement was filed makes the decision to complete the project a Congressional one not subject to review by the courts). In fact, there is no indication in the legislative history of P.L. 95–96 that Congress ever reviewed or debated the EIS in issue. The debates and reports referred to by the intervenors only indicate that Congress was aware of this litigation and the history of a related case in the North Dakota courts.[2]

---

**2.** It should be noted that while the Senate was advised that the EIS had been determined to be adequate by the Court of Appeals for the Eighth Circuit, the Senate was not told that the court there specifically stated that the plaintiffs could bring new litigation challenging the statement. See 123 Cong.Rec. S 11,254–57 (daily ed. June 30, 1977). The language of the Senate Report indicates that Congress remained unaware of the precise decision of the Eighth

Nowhere is there any evidence that Congress even read the EIS which the intervenors claim Congress found to be adequate. Without at least [3] some evidence of this, the Court cannot possibly find any clear and convincing evidence that Congress determined the EIS to be adequate and, thereby, intended to preclude judicial review. Therefore, P.L. 95–96 does not render this litigation moot.

## IV.  CONCLUSION

The Court holds that neither the Stipulation of May 11 nor P.L. 95–96 has rendered this litigation moot. Accordingly, the motion of the intervenors to dismiss or for judgment on the pleadings is denied.

Circuit.  *See* H.R.Rep.No.301, 95th Cong., 1st Sess. 79 (1977).  Consequently it seems plausible to conclude that when Congress appropriated funds for the GDU, it erroneously believed that a final determination of the adequacy of the EIS in issue had been made by the courts. This is another reason why the Court cannot accept the intervenors' contention that P.L. 95–96 indicates Congressional approval of the EIS; action based upon an erroneous assumption cannot be construed as clear and convincing evidence of an intent to preclude judicial review.

**3.**  Even evidence that Congress did study and debate the EIS—without more—would be insufficient to indicate a clear intent to preclude judicial review.  Therefore, in the absence of even this bit of evidence, the Court is thoroughly convinced that no "clear and convincing" evidence has been shown to restrict the Court's review of the EIS.