608 F.2d 861
 13 ERC 1906, 9 Envtl. L. Rep. 20,798
 The STATE OF KANSAS, ex rel., Robert T. STEPHAN, Attorney General
and
The Metropolitan Government of Nashville and Davidson County, Tennessee
and
The State of Minnesota, by its Attorney General Warren
Spannaus, Plaintiffs-Appellants,
v.
Brock ADAMS, as Secretary of the Department of
Transportation; John M. Sullivan, as Administrator of the
Federal Railroad Administration; and the National Railroad
Passenger Corporation, Defendants-Appellees.
 No. 79-2070.
 United States Court of Appeals,
Tenth Circuit.
 Argued Oct. 26, 1979.
Decided Nov. 9, 1979.
 
 Tom L. Green, Asst. Atty. Gen., Topeka, Kan. (Robert T. Stephan, Atty. Gen. and Bruce E. Miller, Deputy Atty. Gen., Topeka, Kan., with him on brief), for plaintiff-appellant State of Kansas.
 Frederick S. Suhler, Jr., Sp. Asst. Atty. Gen., St. Paul, Minn. (Warren R. Spannaus, Atty. Gen., St. Paul, Minn., on brief), for plaintiff-appellant State of Minnesota.
 John L. Kennedy, Brentwood, Tenn., for The Metropolitan Government of Nashville and Davidson County, Tennessee, the intervening plaintiffs-appellants.
 Brigid Hynes-Cherin, Atty., U. S. Dept. of Transportation, Washington, D. C. (John H. Broadley, Atty., U. S. Dept. of Justice, Paul F. Mickey, Jr., Gen. Counsel, and Anthony L. Mondello, Deputy Gen. Counsel, National Railroad Passenger Corp., Washington, D. C., on brief), for defendants-appellees.
 Jim Smith, Atty. Gen. and Thomas A. Beenck, Asst. Atty. Gen., Tallahassee, Fla., on brief, for the State of Florida, as amicus curiae.
 James L. Highshaw and Joseph Guerrieri, Washington, D. C., on brief, for the Railway Labor Executives Association, and John Melcher and Pat Williams, in their individual capacities and on behalf of the class of past, present and future users of rail passenger service in the State of Montana, as amici curiae.
 Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 This suit for injunctive and declaratory relief seeks to prevent the termination of passenger rail service by the National Railroad Passenger Corporation on the Lone Star, Floridian and North Coast Hiawatha trains. The principal claims of the plaintiffs-appellants are that the actions of the defendants-appellees, and in particular of the Secretary of Transportation, in preparing a report and plan for curtailment of rail passenger service were in violation of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-47 (1976) (NEPA), of the Amtrak Improvement Act of 1978, Pub.L.No.95-421, 92 Stat. 923 (1978) (the '78 Act), of the guidelines of the Council on Environmental Quality, 40 C.F.R. §§ 1500.1-.14 (1978), of the National Historic Preservation Act of 1966, 16 U.S.C. §§ 470-470t (1976), and of the Clean Air Act, 42 U.S.C. §§ 7401-642 (1976).
 
 
 2
 The district court granted a temporary restraining order on September 28, 1979, restraining the termination of service as contemplated on October 1, 1979, on the three routes mentioned. Among other things, the court found that the plaintiffs had raised serious issues concerning the statutes involved, that the plaintiffs would suffer immediate and irreparable harm from such termination of service, that it appeared that the plaintiffs had a likelihood of success on the merits of their complaint, and that they had established a public interest in being allowed to maintain the status quo while litigating the merits of their complaint.
 
 
 3
 Following the approval by the President on September 29, 1979, of the Amtrak Reorganization Act of 1979, H.R. 3996 (the '79 Act), the district court considered a motion by the defendants-appellees to dissolve the restraining order. On October 4, 1979, that order was dissolved by a Memorandum Order stating that there had been a significant change in the factual background since entry of the restraining order, and that Congress had passed and the President had signed the '79 Act which purports to specifically adopt and approve by legislative action the administrative report and action reorganizing the Amtrak System and discontinuing passenger service on the Lone Star, Floridian and North Coast Hiawatha trains. Concluding that Congress had debated and weighed which railroad transportation routes would remain, and had deliberately affirmed the Final Report of the Secretary that the particular Amtrak routes and trains in question should be discontinued, the court found that the restraining order must be dissolved. The court added that when Congress ratified the Amtrak administrative decision to eliminate the three trains, it was acting within its power and that its policy decision was not reviewable by the courts.
 
 
 4
 The Memorandum Order of the district court stated further that the parties had stipulated that the court should consider the evidence and arguments presented as that which would be presented on the hearing for a preliminary injunction. The order then denied the preliminary injunction, and the plaintiff-appellant State of Kansas immediately filed a notice of appeal on October 4, 1979.[1]
 
 
 5
 The following day, October 5, the State of Kansas sought a stay from this court. A panel of the court, with one judge dissenting, granted a temporary order restraining the termination of service on the three passenger trains, expediting the appeal by a shortened briefing schedule, and setting oral argument of the appeal on October 26.
 
 
 6
 The appellees then applied to the Circuit Justice for a stay and on October 8 Justice White vacated this court's order "pending the timely filing and disposition of a petition for certiorari to be submitted by Petitioner, or until further order of the court or of the (Circuit Justice)."[2] Concerned that we not act contrary to the Justice's order by proceeding with hearing the appeal on the merits, yet being presented in this court with the merits of the appeal by both sides, it was ascertained that no party contemplated filing a petition for certiorari prior to our hearing. This position was confirmed in writing to the clerk by all counsel prior to oral argument before us on October 26. Oral argument was heard then and we turn now to the appellate arguments presented.
 
 
 7
 As grounds for reversal, the plaintiffs-appellants vigorously argue that the actions of the Secretary in preparing the Final Report to the Congress on the Amtrak route system (2 R. 510 Et seq.), and recommending Inter alia the discontinuance of the three trains involved, violated NEPA in particular, as well as the other statutes cited; that there were no proper hearings and that numerous mandatory procedures for the preparation of an Environmental Impact Statement were not followed; that there was no repeal in the '78 Act or the '79 Act of the procedural requirements of NEPA or the other statutes relied on; that in any event no such repeal by implication should be found; and that the statutes can be harmonized so that the Secretary could comply with the mandatory procedures laid down by these earlier statutes and still accomplish the rail reorganization and curtailment of passenger service contemplated.
 
 
 8
 We are unable to agree with the plaintiffs-appellants. In the '79 Act there is an express definition by the Congress of the "Basic system" of rail service in Section 104, which amends Section 103 of the Rail Passenger Service Act, 45 U.S.C. § 502, to provide as follows:
 
 
 9
 (4) "Basic system" means (A) prior to October 1, 1979, the system of intercity rail passenger service designated by the Secretary under title II and section 403(a) of this Act, and (B) On and after October 1, 1979, the system of intercity rail passenger service designated by the Secretary under section 4 of the Amtrak Improvement Act of 1978 (Public Law 95-421) and approved by the Congress, and service required to be operated under sections 404(d) and 404(e) of this Act and under section 4(g) of the Amtrak Improvement Act of 1978, including changes to such system or service made by the Corporation using the Route and Service Criteria. (Emphasis added).
 
 
 10
 Section 119 of the '79 Act amends section 404 of the Rail Passenger Service Act, 45 U.S.C. § 564, making specific references to the Secretary's Final Report and making specific changes in the Report:
 
 
 11
 Sec. 119. Section 404 of the Rail Passenger Service Act (45 U.S.C. 564) is amended by adding at the end thereof the following new subsections:
 
 
 12
 "(d)(1) Where reductions in operating expenses can be obtained, the Corporation shall operate rail passenger service over any long distance route which is recommended for discontinuance by the Secretary pursuant to section 4 of the Amtrak Improvement Act of 1978 . . .
 
 
 13
 "(e)(1) In order to preserve regional balance in the national intercity rail passenger system and to ensure that long-distance routes recommended for discontinuance by the Secretary pursuant to section 4 of the Amtrak Improvement Act of 1978 which provide service to regions with few population centers on a large geographic area have equal opportunity to qualify for continued operation, the Corporation shall operate a long distance route in each section of the United States . . .
 
 
 14
 "(f) For the purpose of this section and section 4 of the Amtrak Improvement Act of 1978, the reference to Tampa in table 4-1 at page 4-7 of the Secretary's Final Report to Congress on the Amtrak Route System, dated January 1979, shall be deemed to mean Saint Petersburg."
 
 
 15
 It is thus apparent that the Basic system of intercity rail passenger service designated by the Secretary under the '78 Act was given careful consideration by the Congress and that substantive decisions on routes to continue, as well as on authorizations of appropriations, were made. Moreover, it is clear that the references in the '79 Act to systems and to recommendations of the Secretary "pursuant to section 4 of the Amtrak Improvement Act of 1978" are keyed to the Final Report of the Secretary (2 R. 510 Et seq.), since section 4 of the '78 Act is the section authorizing the Final Report, a point which the plaintiffs-appellants acknowledge in their complaint. (1 R. 2, 9).
 
 
 16
 Appellants argue that "(t)o assume a congressional intent to create an independent statutory route structure requires a substantial step beyond the Act's language and results in a negation of plaintiffs' rights under NEPA and the '78 Act." (Brief of State of Kansas, 6). We disagree. It is clear from the language of the Act and the legislative history that this is precisely what Congress intended to do.[3] For example Congressman Florio, the chairman of the Subcommittee which drafted the bill, made the following remarks in discussing the '79 Act (125 Cong.Rec. H 6487):
 
 
 17
 Mr. Chairman, in January of this year, the Department of Transportation recommended a 43-percent cutback in the Amtrak system. The DOT proposal was in response to the requirement of the 1978 Amtrak Act which mandated a reexamination of the Amtrak route structure because Congress was dissatisfied, correctly I think, with performance of the existing system.
 
 
 18
 In the course of examining the DOT proposal, the Commerce Committee under leadership of my chairman, Mr. Staggers, reached the conclusion that the DOT plan had gone too far. DOT eliminated routes which carried significant numbers of passengers, and routes which had gained tremendously in ridership over the past year. Unfortunately, the DOT study used ridership and cost data from 1977 to determine how trains performed.
 
 
 19
 The Commerce Committee chose to use this authorization bill to redesign the Amtrak route system. The Committee could have vetoed the DOT proposal, but that would have sent it back to DOT for a new plan. It is the Congress which should be charged with the responsibility of determining how to change and improve existing system, what kind of route system Amtrak should run, and this bill is the measure of what that system will be. (emphasis added).
 
 
 20
 Congressman Madigan, also a member of the House subcommittee responsible for drafting the bill and one of the floor managers of the debate on the bill, added these remarks. (125 Cong.Rec. H 8626):
 
 
 21
 Mr. Speaker, several States have filed court actions against Amtrak to perpetuate train service in their area. With the enactment of this bill, Congress has ratified the process used by the Secretary in restructuring Amtrak and has modified his restructuring where it was clearly in the public interest do so so. The enactment of this bill into law should lay to rest any questions of congressional intent. (emphasis added).
 
 
 22
 The remarks of Congressman Florio and Congressman Madigan make clear the Congressional intent that the Secretary not redraft the Final Report, since Congress through the '79 Act itself determined what the new basic system would be.[4] As statements of one of the legislation's sponsors, Congressman's Florio's remarks deserve to be accorded substantial weight in interpreting the statute. Federal Energy Administration v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 49 L.Ed.2d 49; Woodwork Manufacturers v. N.L.R.B., 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357. And statements by others responsible for preparation of the bill are likewise accorded deference. Cf. United States v. Wrightwood Dairy Co., 315 U.S. 110, 124-25, 62 S.Ct. 523, 86 L.Ed. 726; United States v. Richards, 583 F.2d 491 (10th Cir.).
 
 
 23
 It is thus our view that the Congress had its attention specifically focused on the Secretary's Final Report and the complaints directed to it. With these concerns in mind the Congress nevertheless gave its imprimatur to portions of the Final Report, including the curtailment of the trains in question, and designated the pattern of the passenger rail system for the future.
 
 
 24
 Appellants argue that such a conclusion is at odds with the way the '78 Act was designed, that it "contemplated a passive role for Congress," leaving the "ultimate selection of routes to the Secretary (with Congress acting) . . . only if to disapprove the final product in its entirety." Thus, because the Secretary is subject to the requirements of NEPA and because neither the '78 Act nor the '79 Act repeal the provisions of NEPA, it is argued that Congress in its passive role did not "approve" the Final Report nor exempt it from the requirements of NEPA. (Brief of the State of Minnesota, 2-7).
 
 
 25
 We are convinced that the legislative record indicates otherwise. Section 4 of the '78 Act did contemplate an arguably "passive" role for Congress in that the Secretary's Final Report would be approved without action of Congress unless specific action were taken to disapprove it. A disapproval would require the Secretary to resubmit a revised recommendation. However it is clear from the '79 Act and the history outlined that Congress did not play a mere passive role with respect to the Final Report. It neither approved it In toto nor rejected it In toto, choosing instead to review the report closely and to use the report as a basis for redesigning a statutory basic system.
 
 
 26
 The whole of this legislative process persuades us that Congress did not leave designing of the passenger system to the Secretary and the appellees' subsequent actions, with further deliberations and administrative procedures under the environmental and other statutes. We feel we have no problem of mere implied repeal of the procedural provisions of NEPA and the other statutes, but a direct Congressional decision designing the basic rail system, without the necessity of following those procedures. See Friends of the Earth v. Armstrong, 485 F.2d 1, 9 (10th Cir.), Cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120.
 
 
 27
 This legislative background is thus unlike that involved in T.V.A. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117, which is relied on by appellants. There the Court held that an appropriations act authorizing funds for the Tellico dam project did not impliedly repeal provisions of the Endangered Species Act of 1973 as it related to the dam project. The Court explained its reasoning as follows (Id. at 190, 98 S.Ct. at 2300):
 
 
 28
 When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden. Without such an assurance, every appropriations measure would be repugnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure. . . . (T)his (would) lead to the absurd result of requiring members to review exhaustively the background of every authorization before voting on an appropriation . . . .
 
 
 29
 We are persuaded that in enacting the '79 Act, Congressional expressions of intent were stronger than those in a mere appropriations measure. The statute and its history plainly indicate that Congress did "review exhaustively" the Final Report and the curtailments it made. The resulting Act approved certain curtailments and made desired alterations as well. These positive legislative directions likewise distinguish our case from both T.V.A. v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117, and National Audubon Society v. Andrus, 442 F.Supp. 42 (D.C.D.C.), on which appellants rely.
 
 
 30
 In sum, we are in agreement with the conclusion of the district court that the '79 Act decides the questions before us.[5] In such a case
 
 
 31
 Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review nor are we vested with the power of veto.
 
 
 32
 T.V.A. v. Hill, supra, 437 U.S. at 194-95, 98 S.Ct. at 2302; See also Vermont Yankee Nuclear Corp. v. Natural Resources Defense Council, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460.
 
 
 33
 Accordingly we conclude that the order denying the preliminary injunction should be affirmed and the cause remanded for further proceedings in accord with this opinion.
 
 
 34
 IT IS SO ORDERED.
 
 
 
 [1]
 An amended notice of appeal was filed on October 17, 1979, adding as appellants the State of Minnesota and the City of Nashville and County of Davidson, Tennessee
 
 
 [2]
 On November 5, 1979, the Supreme Court denied a petition for reconsideration of this order of Justice White
 
 
 [3]
 While the intent of the Act seems clear from its terms we have nevertheless examined the legislative history as well. For "(w)hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " Train v. Colorado Public Interest Research Group, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (quoting United States v. American Trucking Associations, 310 U.S. 534, 543-44, 60 S.Ct. 1059, 84 L.Ed. 1345)
 
 
 [4]
 There is also evidence indicating that noncompliance with NEPA was raised before both the House and Senate Subcommittees which drafted the '79 Act. (See 1 R. 220, 222, 239). Furthermore, the legislative history is replete with comments by various members of Congress indicating their displeasure with the Final Report. E. g., remarks of Congressman Lee, 125 Cong.Rec. H 6487; Congressman Conte, 125 Cong.Rec. H 6490; Congressman Fowler, 125 Cong.Rec. H 6514; Senator Packwood, 125 Cong.Rec. S 11119; Senator Weicker, 125 Cong.Rec. S 11123; and Senator Heinz, S 11125. We feel that the tenor of the comments demonstrates the process of weighing the merit or lack of merit in the Secretary's Final Report and of the system which should emerge
 
 
 [5]
 In reviewing the trial court's denial of a preliminary injunction under 28 U.S.C. § 1292(a), it is true that generally the appellate court should determine only whether the trial court abused its discretion; and the merits of the case may be considered only insofar as they bear on the question of proper judicial discretion. See Penn v. San Juan Hospital, Inc., 528 F.2d 1181 (10th Cir.); United States v. Brown, 331 F.2d 362 (10th Cir.). However, the district court's ruling in this case was based not on an exercise of its discretion but on its firm conclusion that the merits of the issues had been settled by the enactment of the '79 Act. This case is therefore different in this respect from the ordinary review of a denial of a preliminary injunction. Since we agree that the central legal question decided by the trial court is controlling, and there is a strong public interest in a prompt decision on the merits, we also consider the merits of that question. Cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 584-85, 72 S.Ct. 863, 96 L.Ed. 1153